638 N.E.2d 716 (1994)
265 Ill. App.3d 1092
202 Ill.Dec. 848
In re P.F. and E.F., Minors (The People of the State of Illinois, Petitioners-Appellees, v. Sandy F. and James F., Respondents-Appellants).
Nos. 1-92-2979, 92-2980.
Appellate Court of Illinois, First District, Sixth Division.
August 5, 1994.
*718 R. Eden Martin, Geraldine M. Alexis and Brandon D. Lawniczak of Sidley & Austin, Chicago, and Diane L. Redleaf and Laurene Heybach of the Legal Assistance Foundation of Chicago, IL, for appellant.
Patrick T. Murphy and Lee Ann Lowder of the Office of the Public Guardian of Chicago, IL, for appellee.
Presiding Justice EGAN delivered the opinion of the court:
The trial judge "permanently" placed two minor children, E.F. and P.F., in foster care with their maternal grandmother, Dana Bolding, and ordered that the minors' parents, Sandy and James F., have visitation once a month. We consolidated James and Sandy's appeals.
In December, 1989, the Department of Children and Family Services (DCFS) received a report that E.F., born November 24, 1986, and her brother P.F., born July 27, 1988, were being neglected by Sandy and James. A DCFS worker found the family living in an unheated basement, which was accessible only by a step ladder, with no hot water, no cooking facilities, and no food. DCFS filed Petitions for Adjudication of Wardship of E.F. and P.F., alleging that James and Sandy did not give them necessary care and subjected them to an injurious environment.
On December 28, 1989, James and Sandy stipulated "as to probable cause" and agreed to an order of protection. Judge Costa entered an order of protection against James and Sandy, which required them to provide adequate shelter and care for E.F. and P.F. and to attend individual mental health counseling.
On March 22, 1990, Judge Costa conducted a hearing. Randy Smith, a DCFS worker, testified that E.F. and P.F. were currently living with James and Sandy in the attic of James's grandmother's house. This attic had no stove, no hot water, and no refrigerator. *719 The children shared a single bare mattress placed on the floor in a room with no light. Smith explained that the children stayed with either their maternal or paternal grandparents for four days each week. Both grandmothers told Smith that the children were filthy when they came from their parents' apartment.
The children's maternal grandmother, Dana Bolding, testified that she would be "glad" to take custody of the children and that she would always "treat them just like they are [her] own." She testified that the children were always wearing dirty diapers and clothes when she picked them up; sometimes "their bottoms [are] bleeding * * * due to the fact that they are not cleaned with water and bath." When Bolding complained to Sandy about the children's diaper rash, Sandy told Bolding, "You are putting too much stuff on their bottoms; you don't do that when you are trying to heal a child." Bolding believed that E.F.'s speech impediment was based in part on the failure of James and Sandy to talk to and encourage E.F. Further, in Bolding's opinion, Sandy and James are too strict with E.F. and P.F.; they "scream" at the children and lock E.F. and P.F. in their room without lights for hours.
At the conclusion of the hearing, Judge Costa found that James and Sandy violated the order of protection and that the evidence was "sufficient to establish probable cause to believe the truth of the allegations contained in the original petition." He found that appointment of DCFS as temporary custodian was in the best interest of E.F. and P.F. and suggested that DCFS place the children with Bolding. DCFS then placed the children in temporary foster care with Bolding. E.F. and P.F. have been living with Bolding since this March, 1990 placement.
On May 2, 1990, Judge Costa held an adjudicatory hearing. At this hearing, Sandy and James admitted neglect through a failure to provide necessary care. Also, DCFS worker James Balark submitted a court report stating that "both parents voiced minimal interest in employment." They had recently vacated their home, which they admitted had no gas or water, and seemed unconcerned about imminent foreclosure. Balark concluded: "Both parents exhibit dysfunctioning in the ability to cope with those demands inherent in clothing, feeding and attention to their children's social and emotional growth. * * * They are clearly incapable of resuming primary custody of [P.F. and E.F.]"
On October 2, 1990, Judge Brownfield held a dispositional hearing and determined that the F's were unable to care for their children. He made DCFS the guardian and custodian of E.F. and P.F.
DCFS left the children with Bolding and established a service plan for James and Sandy which listed "return home" as the "permanency goal." DCFS gave Sandy assistance finding and maintaining housing. Nonetheless, in November, 1990, a DCFS caseworker noted, "housing is not the only problem here; parents volunteer for defense station but refuse to take menial [paying] jobs." DCFS also provided counseling to James and Sandy.
Many reports from psychologists and psychiatrists were filed with the court. For example, J.M. Whitman, a psychiatrist, reported that Sandy "absolutely denied that she thought there was any problem whatsoever in [her] and her husband, neither working and with no visible income, bringing up [their] children." Also, when asked why E.F. and P.F. had been removed from her home, Sandy replied: "You tell meI have NO idea." Whitman reviewed Sandy's prior psychological reports and evaluations, including Sandy's Proviso Family Services therapy notes. In February, 1990, Sandy was "seriously depressed and overwhelmed" and told her Proviso therapist that "it might be better if they just took the kids."
Whitman described James as "unkempt." James showed a clear "underlying hostility" and a "`no care' attitude." James did not show any concern over his failure to earn a regular income and stated that he would "probably not" ever work "a 40 hour week with bull shit work" again. He blamed DCFS for the removal of E.F. and P.F. from his home.
*720 Whitman had difficulty interviewing E.F. because of her "marked speech problem"; E.F. appeared to understand questions well but could not effectively communicate her answers "because of pronunciation problems." Whitman believed that "some of her verbal difficulties may be the result of lack of exposure and lack of teaching in her parents' home." Bolding told Whitman she was enrolling E.F. in speech therapy. Whitman noted that E.F. "is obviously a child very much at risk, and over the years will need much more attention and remedial help, and consistency and security, than she could possibly have in a home with her biological mother and father."
Beginning in March, 1991, Judge White took responsibility for this case. On March 22, 1991, based on DCFS's conclusion that Sandy and James were making satisfactory progress toward the service plan goal of returning E.F. and P.F. home, Sandy filed a restoration motion requesting vacation of DCFS custody, immediate unsupervised visits, and the return of E.F. and P.F. to James and Sandy. She renewed this motion on May 20, 1991.
On May 29, 1991, Judge White conducted the first of many hearings on this motion. Bolding testified that Sandy and James had visited the children only infrequently. Although DCFS arranged for James and Sandy to have the children all day on Sundays beginning in early April, James and Sandy only took the children on the first two Sundays in April. Bolding stated that Sandy "is ill with [the children]; they aggravate her; she can't tolerate them." Similarly, James did not interact well with the children.
Tom Stabnicki, the family's DCFS caseworker, testified that he had worked with the family since January, 1991. He believed that the only reason the children were removed from Sandy and James was "housing conditions" and that DCFS had always had return home as the goal for E.F. and P.F. Stabnicki had observed three of the parents' visits with the children. James raised his voice with E.F. and P.F., was "not at ease" with the children, and was "somewhat defiant in his contact with them." On the other hand, Sandy was "much more positive" and "actively is involved with the children." Bolding also acted appropriately with the children.
On July 11, 1991, Stabnicki testified that DCFS was assisting the family with furnishing their apartment. He stated that the children seemed happy to go on overnight visits with their parents and had "always expressed * * * a positive feeling about going on these visits." He admitted that the children often "acted out" after the visits and acknowledged 10 incident reports, filed with the court, from the children's daycare center involving days after visits. Nonetheless, he believed that any incidents of unusual behavior after the visits stemmed from the children's frustration with "the severity of the change" caused by the visits. He admitted that his supervisor disagreed "with [his] assessment" and was not in favor of unsupervised visits. The judge received a memo from Stabnicki's supervisor, Sylvia Jones, who stated: "I am not in agreement with any efforts for return home on this date based on the psychological [sic] that are present in the record."
At the conclusion of the testimony, Judge White found that continued overnight unsupervised visits would not be in the best interest of the children and refused to assume that the children were acting out after the visits only because they did not like change. She requested new psychological evaluations of Sandy and the children.
At a March 31, 1992 hearing, Charles Bowden, a DCFS supervisor, testified that Stabnicki was no longer assigned to this case, that Tonya Allen of DCFS had taken responsibility for the family, and that DCFS had contracted with a private agency, Lutheran Social Services of Illinois (LSSI), to handle the case.
On May 26 and 27, 1992, the judge heard extensive testimony. Allen testified that she had been the family's DCFS caseworker for three months. She visited the apartment DCFS procured for Sandy and James several times, but then they were evicted from the apartment. She called Sandy before each visit. Nonetheless, on one visit she noticed something in the bath tub; Sandy told her the cat had defecated in the tub the previous *721 day. When asked why the tub was not clean, Sandy told Allen she "was getting to it." After the eviction, Allen referred Sandy and James to another housing agency, but Sandy and James did not attend several scheduled appointments.
Sandy testified that she had been employed as a security guard since January, 1992. She had been attending counseling at Proviso approximately once a week to help her prepare for the return of her children and was willing to continue in therapy. Sandy stated that E.F. and P.F. told her "they don't like [Bolding]; they are unhappy." In Sandy's opinion, Bolding did not spend enough time with the children and did not serve them well-balanced meals. Also, Bolding smokes and Sandy noticed that P.F. "has problems breathing" because of this smoke.
Sandy admitted that she had recently been evicted from the apartment DCFS had helped her to obtain and furnish. She did not pay the rent because there were many problems with the apartment. At the time of the hearing, she was living part-time with James "at his grandmother's garage" and part-time at her church, although the church was "not really" equipped for sleeping. She financially supported James. When asked how much James made with his occasional "handyman" work, Sandy replied: "You would have to ask him, that's his money."
She testified that there was a broken window in the kitchen of her last apartment but the window did not pose any danger to the children because the "children do not go into the kitchen, it's not allowed." She did not believe that a hole in her dining room wall around a light switch posed a hazard to the children even though it left wiring exposed. Sandy explained: "They were told not to touch it. They did not touch it." James admitted that he created the hole in the dining room wall when he was "fixing" the wiring. He did not fix the broken window in the kitchen and did not believe it was dangerous for the children because "that's a room they never went in."
Sandra Stich, the owner and director of the Little People Learning Center, testified that Bolding enrolled both E.F. and P.F. in her daycare center. She testified that E.F. and P.F. are not as developed as most children their age. P.F. did not talk when he first came to the center, even though he was two years-old, and was delayed in his toilet training. On Monday and Tuesday, P.F. had more toilet problems and both children were less apt to follow directions and more likely to misbehave. The incident reports filed with the court on July 11 were completed by Stich and primarily involved P.F. biting or hitting other children. Stich explained that these incidents usually occurred after the children had seen their parents and that when she asked why P.F. "head butted" another child, he told her "he did it at his mommy's." In response to a question from the judge, Stich agreed that E.F. and P.F. "stand out in their inability to adjust [from] the weekend" compared to the other children. According to Stich, the children are "very loving" toward Bolding. Although she has "an open door policy" allowing for parental visitation at any time, Sandy and James had only visited E.F. and P.F. three times at the center.
Several psychological professionals testified at the hearing. For example, Christine Anderson, a consultant at Great Lakes Psychological Services, believed James and Sandy had "unrealistic expectations" regarding E.F. and P.F. When Anderson asked how P.F. learned to walk down the stairs, the parents told her they "forced him down the stairs until he could do it." Anderson testified that the children could return home only after the parents participated in therapeutic parenting classes. Another Great Lakes examiner, Paul Linden, recommended that E.F. and P.F. remain with Bolding and that Sandy have supervised visitation "until she and her husband [are] able to demonstrate a consistent period of life stability."
Sandy called Karen Budd to testify as an expert in child and clinical psychology. Budd stated that the tests used by Linden are not appropriate for measuring parenting skills and disagreed with Linden's interpretation of his own test data. Budd testified that James and Sandy were aware that they had allowed E.F. and P.F. to be in unsafe surroundings, "felt responsible for that," and *722 were "very sincere" about their desire to improve. They interacted naturally and appropriately with E.F. and P.F. and the children were "very responsive to their parents." Nonetheless, both James and Sandy scored in the "elevated" range regarding potential for child abuse. In Budd's opinion, a return home would be in the best interest of E.F. and P.F. She explained that reunification should be done slowly, with supportive services including therapy for Sandy and James. Budd admitted that she "would be surprised" to learn that Sandy's current therapist had diagnosed her as having major depression and that, "with further information, it could affect [her] opinion."
The Public Guardian filed an emergency motion to suspend visitation based on a sexual abuse allegation made by the family's LSSI caseworker, Harriet Taylor, against James. Many witnesses, including Taylor, eventually agreed that the allegation was essentially baseless.
On August 11, 1992, the judge gave her ruling. In her opinion, E.F. and P.F. needed consistent stability which the parents could not afford themselves. She found Sandy and James "unfit and unable" to care for E.F. and P.F. Therefore, she ordered that in the best interest of the children, the children were to stay in "long-term placement" with their grandmother and that "no further efforts [were] to be made towards these children [to] place them with the parents." However, she did not make any change in the October, 1990 order giving guardianship and custody to DCFS. The judge also found that, as the children grew, it would be in their best interest to have supervised visits with their parents so long as the parents did not criticize Bolding during the visits. Over Sandy's objection, she ordered that LSSI remain the agency in charge of the case. She later modified this order to give LSSI discretion to terminate a visit if Sandy and James "behave inappropriately" and ordered a "gradual" decrease in visitation to once a month.
Sandy and James first argue that the judge denied them procedural due process because she did not give them explicit notice that she would "effectively terminate" their parental rights and because she did not apply a clear and convincing evidence standard when finding them unfit. The petitioners, the State and Public Guardian, do not dispute that a finding of parental unfitness leading to a termination of parental rights implicates due process. (See Stanley v. Illinois (1972), 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551; In re Enis (1988), 121 Ill.2d 124, 129, 117 Ill.Dec. 201, 520 N.E.2d 362.) Before parental rights may be terminated, the State must give the parents explicit notice that their rights might be terminated (In re B.K. (1984), 121 Ill.App.3d 662, 77 Ill.Dec. 184, 460 N.E.2d 43), and must show "at least clear and convincing evidence" that the parents are unfit. Enis, 121 Ill.2d at 131-32, 117 Ill.Dec. 201, 520 N.E.2d 362.
Under the Juvenile Court Act of 1987, a parent's fitness may be put in issue in several ways. Section 2-23 of the Act explains that, when the court determines a minor is neglected, as the judge did in this case on October 2, 1990, custody may not be restored to the parents until the judge finds that the parents are fit. (Ill.Rev.Stat.1991, ch. 37, par. 802-23.) On the other hand, when the State desires to terminate parental rights, it must file a petition explicitly alleging parental unfitness under sections 2-13 and 2-29(2). Ill.Rev.Stat.1991, ch. 37., pars. 802-13, 802-29(2).
A termination of parental rights is a final and complete severance of the child from the parent. It is a determination "that the person as a matter of law [should not] continue in the legal status as `parent'" and removes "the entire bundle of parental rights, custodial and noncustodial." (In re T.G. (1986), 147 Ill.App.3d 484, 488, 101 Ill. Dec. 188, 498 N.E.2d 370.) An order terminating parental rights "is final and a subsequent petition for restoration of custody will not be heard." (T.G., 147 Ill.App.3d at 488-89,101 Ill.Dec. 188,498 N.E.2d 370.) Once a parents' rights are terminated, the court may give another party the right to consent to the adoption of the children. In re T.B. (1991), 215 Ill.App.3d 1059, 1061, 158 Ill.Dec. 780, 574 N.E.2d 893; Ill.Rev.Stat.1991, ch. 37, par. 802-29(2).
*723 In this case, where the parents retain visitation rights and where neither DCFS nor Bolding was given authority to consent to adoption, it is clear that all of the parent's rights regarding the children were not severed. In recognition of this fact, Sandy and James urge this court to consider "the practical effect of the Court's order [which] is a de facto termination of [their] parental rights." An identical argument was rejected in In re S.J.K. (1986), 149 Ill.App.3d 663, 103 Ill.Dec. 75, 500 N.E.2d 1146. The S.J.K. trial judge awarded "permanent" custody to the foster parents, terminated the guardianship of DCFS, and completely "suspended" the parent's visitation rights. The parent asserted that the judge's acts constituted a de facto termination of parental rights. The court rejected the idea of de facto termination, and held that the judge's order was not a termination of the parent's rights and that it was clear the judge did not intend to terminate parental rights. S.J.K., 149 Ill.App.3d at 673, 103 Ill.Dec. 75, 500 N.E.2d 1146.
Following S.J.K., we reject the argument that the parents' parental rights were terminated. Here, the judge allowed the parents even more exercise of their rights than did the S.J.K. judge by giving them monthly visitation, and like the S.J.K. judge, indicated her intent not to terminate the parents' rights by leaving DCFS as the guardian and by not giving anyone authority to consent to adoption. The judge simply employed section 2-23 to modify the October 2, 1990 dispositional order. Sandy and James therefore "have a right to petition the court for restoration of parental rights and change of custody" at any time. (S.J.K., 149 Ill.App.3d at 673, 103 Ill.Dec. 75, 500 N.E.2d 1146.) They have not lost "the entire bundle" of parental rights; we therefore hold that their parental rights were not terminated. Accordingly, they were not entitled to the due process protections of specific notice and clear and convincing evidence of unfitness which accompany a termination of parental rights. Thus, their due process arguments must fail.
Moreover, although not necessary to our holding, we note that the parents unquestionably received due process. The parents had notice that fitness under section 2-23 would be in issue. First, they put fitness in issue themselves when Sandy filed the motion for restoration. Section 2-23 provides that custody of a neglected minor "shall not be restored to any parent * * * until such time as a hearing is held on the issue of the fitness of such parent * * * to care for the minor." (Emphasis added.) (Ill.Rev.Stat.1991, ch. 37, par. 802-23.) Moreover, although the parents characterize the original removal of the children as based solely on housing concerns, the record belies this assertion and shows that Sandy and James knew fitness was also an issue. The December 28, 1989 order required James and Sandy to attend counseling, indicating that more than housing was in issue from the very beginning of this case. In November, 1990, a DCFS caseworker reported that "housing is not the only problem here" and Stabnicki's supervisor later told the court she disagreed with the return home goal based on the psychological evaluations of the parents. Finally, the judge gave the parents notice that she was determining fitness under section 2-23 when she repeatedly stated that she was concerned with the parents' ability to parent. In fact, Sandy's attorney noted on May 26, 1992, that the parents' "readiness" to parent was in issue.
Also, section 2-23 does not require clear and convincing evidence of unfitness. The two fitness determinations under the Act involve different burdens of proof. In In re T.B. (1991), 215 Ill.App.3d 1059, 1061, 158 Ill.Dec. 780, 574 N.E.2d 893, the court noted "the differences in the burden of proof between the section 2-23 provision relating to removing custody and guardianship from an unfit parent following a finding of neglect and the section 2-29 finding of unfitness required for termination of parental rights. Similarly, we hold that clear and convincing evidence is not required for a finding of unfitness under section 2-23, but that the preponderance of the evidence standard applicable to most Act sections applies. (See Enis, 121 Ill.2d at 132-33, 117 Ill.Dec. 201, 520 N.E.2d 362.) Therefore, the parents' due process rights were not violated by the trial judge's failure to use the clear and convincing evidence standard in her determination that the parents were unfit to regain custody of their children under section 2-23.
*724 Sandy and James additionally argue that the trial judge violated their Illinois Constitutional right to privacy by not applying a clear and convincing evidence standard. They assert that the right to privacy explicitly granted in Article I of the Illinois Constitution must be applied to the parenting context "without restrictions."
It is well-settled that, "[a]s with other fundamental rights, the right to establish a family and raise children may be curtailed or eliminated by State law if the purpose of the law is to advance a compelling State interest." (Helvey v. Rednour (1980), 86 Ill.App.3d 154, 158, 41 Ill.Dec. 671, 408 N.E.2d 17.) Further, "the protection of the welfare of a child has been recognized as being a sufficiently compelling interest" to override parental rights (Helvey, 86 Ill. App.3d at 159, 41 Ill.Dec. 671, 408 N.E.2d 17), and "[t]his policy applies to all the proceedings under the Juvenile Court Act" (In re J.M. (1988), 170 Ill.App.3d 552, 562, 121 Ill.Dec. 193, 524 N.E.2d 1241). In fact, the legislature recognized that parental rights must yield to the compelling state interest in child welfare in section 1-2 of the Act: "The parents' right to the custody of their child shall not prevail when the court determines that it is contrary to the best interests of the child." (Ill. Rev. Stat. ch. 37, par. 801-2(3)(c).) Accordingly, we hold that the Act provisions allowing for limits on parental rights where a preponderance of the evidence shows those limits are in the best interest of the minor do not violate the Illinois right to privacy. See J.M., 170 Ill.App.3d at 562, 121 Ill.Dec. 193, 524 N.E.2d 1241; see also In re D.L. (1992), 226 Ill.App.3d 177, 184, 168 Ill.Dec. 280, 589 N.E.2d 680.
The parents next argue that the judge improperly exceeded her authority under the Juvenile Court Act by awarding "long-term permanent" foster care and by ordering DCFS to retain LSSI and to cease efforts at reunification. Also, they assert that her orders regarding DCFS were an improper invasion of DCFS's statutory authority. Instead of responding to the parents' state law arguments, the Public Guardian and State assert that the Federal Adoption Assistance and Child Welfare Act (AAA) governs "the responsibility for permanency planning for foster children in state courts."
We reject the assertion that most of this case is governed by the Juvenile Court Act but that, for the sole question of long-term placement, federal law governs. First, the AAA does not unequivocally allow long-term permanent foster care. The AAA provides that states receiving federal foster care funding must hold dispositional hearings in a timely manner and notes that an acceptable disposition for a child "with special needs or circumstances" might be long-term permanent foster care. (42 U.S.C. §§ 620-628 (1990).) The statute has never been held to allow long-term permanent care; the plain language of the statute obviously allows this care only in special circumstances. Thus, even if this statute did apply here, it would not necessarily validate the judge's order.
Second, the AAA may not be used in the fashion requested by the State and Public Guardian, and in fact has never been held to control any substantive state court determination. The State and Public Guardian cite no case law and give no explanation for the assertion that the AAA, a federal funding statute, governs the disposition of individual state cases. As the parents note, the Sixth Circuit recently held that an individual claimant could not rely on the AAA to compel a particular case disposition. (Lesher v. Lavrich (6th Cir. 1986), 784 F.2d 193, 197-98.) In fact, the Lesher court indicated that the AAA might be available to individual plaintiffs seeking to compel their State to comply with the AAA or lose funding, but that it might not even provide a private right of action in that instance. (784 F.2d at 197.) A concurring judge believed that the federal courts should not interfere at all with the traditional state court area of child welfare by applying the AAA. (Lesher, 784 F.2d at 198.) In re Ashley K. (1991), 212 Ill.App.3d 849, 870-71, 891, 156 Ill.Dec. 925, 571 N.E.2d 905, the only case relied on by the State and Public Guardian to support their assertions regarding the AAA, did not apply its provisions, but simply noted that the failure to hold a timely hearing jeopardized the state's right to federal funding.
*725 Therefore, we hold that the AAA may not be used to justify the judge's award of permanent long-term placement. Instead, we will apply the Juvenile Court Act to all portions of this appeal. Under that Act, it is well-settled that a juvenile court judge may choose only among the dispositional alternatives provided in the statute and "may not exceed [her] statutory authority no matter how desirable or beneficial the attempted innovation might be." (In re Peak (1978), 59 Ill.App.3d 548, 551-52, 16 Ill.Dec. 755, 375 N.E.2d 862; see also In re Violetta B. (1991), 210 Ill.App.3d 521, 535, 154 Ill.Dec. 896, 568 N.E.2d 1345.) The T.B. court explained that, unless the court terminates parental rights under section 2-29, "the trial court's discretion in entering a dispositional order is limited [to] the alternatives available" under section 2-27 of the Act. (215 Ill.App.3d at 1061, 158 Ill.Dec. 780, 574 N.E.2d 893.) According to T.B., the lower standard of proof for unfitness under section 2-23 requires that the court use only these listed dispositional alternatives.
Neither section 2-27 nor any other portion of the Act provides for a disposition of "long-term permanent placement" with a foster parent. Section 2-27 lists several alternatives a judge may choose if she finds the parents are unfit under section 2-23, including: "Place him in the custody of a suitable relative * * * [or] commit him to [DCFS] for care and service." (Ill.Rev.Stat.1991, ch. 37, par. 802-27(a), (d).) If the judge chooses to place the minor in the custody of a relative, the statute explains that she "shall appoint [the relative] the legal custodian or guardian of the person of the minor." (Ill.Rev.Stat. 1991, ch. 37, par. 802-27(3).) If the minor is committed to DCFS, DCFS has the duty to prepare a service plan and place the child in foster care. (Ill.Rev.Stat.1991, ch. 23, pars. 5005(a)(1)(A), 5006a.) That is what happened on October 2, 1990, when Judge Brownfield made DCFS the children's guardian and custodian and DCFS placed them with Bolding.
Whether the minor is placed with DCFS or with a "suitable relative" under section 2-27, the placement is not "permanent" because the parents, whose rights have not been terminated, retain the right to petition the court for a restoration of custody. (S.J.K., 149 Ill.App.3d at 673, 103 Ill.Dec. 75, 500 N.E.2d 1146; Ill.Rev.Stat.1991, ch. 37, pars. 802-23(3), 28(3); see also In re Patricia S. (1991), 222 Ill.App.3d 585, 593, 165 Ill.Dec. 91, 584 N.E.2d 270.) Sections 2-23(3) and 2-28(3) mandate that "[a]n order depriving the parents of the custody of a child is a continuing order which is only res judicata as to the facts which existed at the time the order was entered and the parents have a right to petition the court for a restoration of their parental rights and change of custody until the court terminates all of their legal rights to the child." (S.J.K., 149 Ill.App.3d at 673.) In S.J.K., where the court entered an order giving the foster parents "permanent" custody, the court held that the award could be permanent only if the parent's parental rights were first terminated. (149 Ill.App.3d at 673.) In that case, where the trial court did not terminate parental rights, the court reversed the award of "permanent" custody and remanded with directions to delete the word "permanent" from the order. S.J.K., 149 Ill.App.3d at 673. 103 Ill.Dec. 75, 500 N.E.2d 1146.
Applying this law, we believe that there are some errors in the judge's August 11, 1992 order regarding placement. The judge did not exercise any of the acceptable section 2-27 placement alternatives. Her principal error, under the Act and S.J.K., was the award of "permanent long-term placement." She also erred because she did not give Bolding custody, an available option under section 2-27, but only gave her "placement." The judge additionally left custody and guardianship with DCFS, in disregard of the section 2-27 requirement that, if a judge places the minors with a relative, the judge "shall" give the relative custody or guardianship. Accordingly, we reverse the "placement" order and remand with directions to comply with the Act by modifying the order to give Bolding temporary custody of E.F. and P.F., subject to James and Sandy's right to petition for restoration, and to terminate DCFS's custody and guardianship.
For similar reasons, the judge's order requiring DCFS to cease all efforts at *726 reunification was improper. That order was consistent with a termination of parental rights, and not with a section 2-23 determination that, at the time of the hearing, custody should not be returned to the parents. (S.J.K., 149 Ill.App.3d at 673, 103 Ill.Dec.75, 500 N.E.2d 1146.) When the parents' rights are not terminated, there is no provision in the Act authorizing an order requiring DCFS to cease attempts to reunify the family. The order here precludes the possibility of successful reunification services and a successful petition for restoration in the future. If that is the result desired by the trial judge, she must direct the State's Attorney to file a petition requesting a termination of parental rights. (See Ill.Rev.Stat.1991, ch. 37, par. 802-13.) In this case, where the State correctly argues parental rights were not terminated, an order making the change of custody essentially irrevocable is improper.
Moreover, under its governing statutory provisions, DCFS is required to assist all neglected children, even those not committed to its care, by establishing a service plan "designed to stabilize the family situation and prevent placement of a child outside the home of the family, [and] reunify the family if temporary placement is necessary." (Ill.Rev.Stat.1991, ch. 23, par. 5006a(a).) As we have explained, DCFS is given wide discretion, and while a court may overrule this discretion when it has been abused (Ill.Rev. Stat.1991, ch. 37, 802-28), "the power of the court over the Department is not unlimited." (In re F.B. (1990), 206 Ill.App.3d 140, 156, 151 Ill.Dec. 196, 564 N.E.2d 173.) Therefore, we reverse the portion of the judge's order requiring DCFS not to exercise its statutory duty by attempting family reunification.
Finally, the part of the order requiring LSSI to remain as the caseworker must be reversed. There is no Act provision authorizing a judge to enter an order interfering with DCFS's administrative discretion to this degree. (See generally F.B., 206 Ill. App.3d at 156, 151 Ill.Dec. 196, 564 N.E.2d 173.) The legislature has given DCFS the authority to contract with "any public or private agency" for the provision of services to people DCFS must serve. (Ill.Rev.Stat. 1991, ch. 23, par. 5023.) DCFS's regulations provide for an intra-agency administrative review of any claim regarding the service plan, including the use of a contracted outside agency. (89 Ill. Adm. Code § 309.3, .4 (1991).) The agency decision may then be reviewed "only under and in accordance with the Administrative Review Law" and "no court shall have jurisdiction to review the subject matter of any order made by [DCFS] except" under the Administrative Review Act. (Ill.Rev.Stat.1991, ch. 23, par. 5009.9.) Therefore, the trial judge's review of the appointment of LSSI was improper. While the judge was understandably frustrated by DCFS's internal disagreement regarding the family and apparent mismanagement of this case, she could not "punish" DCFS by overruling its discretion in this manner. (Violetta B., 210 Ill.App.3d at 535, 154 Ill.Dec. 896, 568 N.E.2d 1345.) Thus, we reverse the portion of her order providing that LSSI must remain on the case.
The parents also contend that the judge exceeded her authority under the Act and invaded DCFS's discretion by ordering that they have visitation only monthly and by giving LSSI discretion to suspend any visit for "inappropriate" behavior. Sandy and James assert that this type of order could be entered only as an order of protection. Section 1-3(13) of the Act provides that parents who have lost custody still retain several rights, including "the right to reasonable visitation." Citing DCFS regulations, Sandy and James argue that "visits at least once a week are necessary where the goal for the child is to return home." (See 89 Ill. Adm. Code § 305.7 (1991).) They urge us to hold that visitation less than once a week is unreasonable. We decline to reach this question, which is not necessary to decide this issue, and leave the question of reasonableness to the trial judge and DCFS.
However, we judge that the visitation provisions in the judge's order, as modified, may be entered only through an order of protection. Section 2-25 of the Act gives a trial judge authority to "set forth reasonable conditions of behavior to be observed for a specified period" in an order of protection. (Emphasis added.) (Ill.Rev.Stat.1991, ch. 37, par. 802-25(1).) The order may "permit a *727 parent to visit the minor at stated periods" and may order a parent "to abstain from offensive conduct against * * * any person to whom custody of the minor is awarded." (Ill.Rev.Stat.1991, ch. 37, par. 802-25(b), (c).) There is no other Act provision authorizing the action taken by the judge regarding visitation.
The parents argue that several of the section 2-25 provisions were violated here. We agree with their assertion that the order was improperly not limited to a "specified period" of time, and therefore do not reach their arguments involving notice. In S.J.K., the trial judge indefinitely "suspended" the parent's visitation in a dispositional order, but never entered an order of protection. On appeal, the court held that all of the parent's visitation rights could be stopped based on the trial judge's "finding that continued visitation would endanger the physical and emotional well-being of the minor." (S.J.K., 149 Ill.App.3d at 673, 103 Ill.Dec. 75, 500 N.E.2d 1146.) Nonetheless, the court reversed the order suspending visitation because it was not a proper order of protection. Under the Act, "the suspension of [the parent's] visitation rights with her child without limitation was impermissible." (149 Ill.App.3d at 673, 103 Ill.Dec. 75, 500 N.E.2d 1146.) The court remanded with directions for the trial judge to enter an order of protection for a specific time period.
We find S.J.K. controlling. Therefore, we reject the argument of the Public Guardian and the State that S.J.K. does not require a reversal in this case because a specified time is required only in an order completely suspending visitation. Their reading of S.J.K. has no basis in the statutory language that all orders of protection must be for "a specified period." We reverse the judge's visitation order and remand for entry of a proper order of protection for a limited time.
Finally, we reverse the judge's decision that visits should only occur monthly and remand for a new hearing regarding visitation, because, unlike in S.J.K., the trial judge here did not determine visitation should cease because it was harmful to E.F. and P.F. As noted above, we do not hold that James and Sandy deserve visitation once a week. Nonetheless, the judge made clear in her ruling that she was limiting visitation because she did not want reunification of this family, and not because she thought visitation could harm the children as in S.J.K. In fact, she indicated that some visitation would benefit the children. Her visitation limit was explicitly meant to keep James and Sandy from regaining custody of their children. As we have explained, this is an improper goal because the judge did not terminate parental rights. On remand, she should determine what reasonable visitation is appropriate in this case.
James and Sandy's final point is that the evidence shows they could be adequate parents, and that the judge's decision to place their children with Bolding was therefore against the manifest weight of the evidence. The State and Public Guardian assert that the only question before the judge when making her custody decision was the best interest of E.F. and P.F. and that her decision that it was in their best interest to live with Bolding is well-supported by the evidence. We agree with the State and Public Guardian and hold that the placement decision was not against the manifest weight of the evidence. Of course, we make this decision with the understanding that the parents still have the right, perhaps after DCFS counseling and parenting classes, to petition the court for a new best interest determination.
The parents' argument is based on two main assertions: they only lost their children in March, 1990, because of housing conditions and no witness testified they could never be adequate parents. Neither assertion provides a ground for reversing the judge's best interest determination. As we have explained, it was clear as early as December, 1989, when the judge ordered the parents to attend counseling, that there was more in question here than housing. As much as the parents want to represent this as a case in which their only sin was poverty, the facts do not support that representation.
Second, even if the parents' characterization of the many reports and witnesses who said they should not have custody of the children is accurate on the specific point of *728 future ability to parent, it is legally irrelevant. In 1959, the supreme court explained that the adequacy of the natural parents is not controlling: "The best interest of the child is the standard and it is not necessary that the natural parent be found unfit or be found to have legally forfeited his rights to custody, if it is the best interest of the child that he be placed in the custody of someone other than the natural parent." Giacopelli v. The Florence Crittenton Home (1959), 16 Ill.2d 556, 565, 158 N.E.2d 613; see also In re Custody of Townsend (1981), 86 Ill.2d 502, 56 Ill.Dec. 685, 427 N.E.2d 1231.
When reviewing a determination of a minor's best interest in a child custody case, "wide discretion is vested in the trial judge to an even greater degree than any ordinary appeal" because of "the delicacy and difficulty of child custody cases." (D.L., 226 Ill. App.3d at 185, 168 Ill.Dec. 280, 589 N.E.2d 680.) Therefore, we will reverse a child custody decision only if it "results in manifest injustice or is palpably against the manifest weight of the evidence." D.L., 226 Ill.App.3d at 185, 168 Ill.Dec. 280, 589 N.E.2d 680.
In their briefs, the parents do not even attempt to show that the judge's best interest determination, as an issue aside from the adequacy of Sandy and James's parenting skills, was "palpably against the manifest weight of the evidence." Much of the evidence supports the judge's best interest decision. The facts, as extensively outlined above, show that the children's best interest was served by placing them in the stable home provided by Bolding. Even without the psychological reports, the evidence from DCFS workers and Bolding shows that James and Sandy did not clean their children or their environment, did not understand how children develop, and did not have a basic comprehension of how to provide for their children. Moreover, James and Sandy's own testimony supports these conclusions. Coupled with several negative psychological evaluations and the incident reports from Stich, this testimony gave the judge a great deal of support for her decision. Even their own witness, Budd, agreed that her opinion might change based on Sandy's depression and believed the parents needed counseling and parenting training before receiving custody. Accordingly, we hold that the judge's best interest determination was amply supported by the evidence.
In summary, we hold that the respondents' parental rights were not terminated. Also, the respondents' due process and privacy rights were not violated by the judge's proper use of section 2-23 to determine their unfitness to regain custody. Additionally, when the relevant question of the children's best interest is considered, the evidence amply supports the judge's decision to place the children with Bolding.
On the other hand, the judge could not grant "long-term permanent placement"; she could give Bolding only temporary custody after taking custody from DCFS. She could not order DCFS to cease reunification efforts. Also, the judge had no authority to interfere with DCFS's discretion by ordering LSSI to remain on this case. Therefore, we reverse these portions of her order and remand with directions to eliminate the portions ordering DCFS to cease its statutorily-required activities, to terminate DCFS's custody and guardianship, and to give Bolding temporary custody. Similarly, we reverse the judge's visitation order and remand with directions to enter a proper order of protection regarding reasonable visitation after a hearing consistent with the views expressed in this opinion.
For all of these reasons, the judgment of the circuit court is affirmed in part and reversed in part.
Affirmed in part; reversed in part and remanded with directions.
McNAMARA and GIANNIS, JJ., concur.