NOTICE
Decision filed 08/05/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 240338-U

NO. 5-24-0338

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | |
|---|---|
| *In re* MARY-AMBER S., a Minor | Appeal from the |
| | Circuit Court of |
| (The People of the State of Illinois, Petitioner-Appellee; | St. Clair County. |
| Andrea L. Rako, Intervenor-Appellant; The Department | |
| of Children and Family Services, Appellee). | No. 22-JA-188 |
| | |
| | Honorable |
| | Elaine L. LeChien, |
| | Judge, presiding. |

JUSTICE McHANEY delivered the judgment of the court.
Justices Boie and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Where the trial court's order granting the Illinois Department of Children and Family Services' motion to reconsider its dispositional order was correct, we affirm.

¶ 2    Andrea L. Rako (Rako), the maternal grandmother of Mary-Amber S. (M.-A.S.), intervened in this case, and later filed a motion seeking guardianship of the child. At the conclusion of the dispositional hearing, the trial court made M.-A.S. a ward of the court, named Rako as the child's custodian, and designated the Department of Children and Family Services (DCFS) as the child's guardian. DCFS filed an emergency motion to reconsider the dispositional order, arguing that the court erred in splitting custody and guardianship between Rako and DCFS. The trial court stayed its order, and granted DCFS's motion to reconsider, from which Rako now appeals.

1

¶ 3                                  I. BACKGROUND

¶ 4      We recite only those facts necessary to our understanding of the case and resolution of this

appeal. Teagan S. is the mother of a female child, M.-A.S.[1] DCFS became involved in this case

immediately after the child's birth upon receipt of a hotline call from the hospital where she was

delivered. After her birth, M.-A.S. tested positive for marijuana, while Teagan tested positive for

marijuana and fentanyl. M.-A.S. remained hospitalized until October 21, 2022.

¶ 5      The State filed a petition seeking wardship on October 25, 2022. Count I of the petition

alleged that M.-A.S. was neglected because Teagan received no prenatal care during the pregnancy

and, upon M.-A.S.'s birth, they both tested positive for controlled substances. 705 ILCS 405/2-

3(1)(c) (West 2022). In count II, the State alleged neglect on the basis that M.-A.S. was in an

environment injurious to her health and welfare. The State also alleged that Teagan tested positive

for fentanyl and marijuana on October 16, 2022.

¶ 6      Additionally, on the date after M.-A.S. was discharged from the hospital, Teagan posted a

video to a social media platform "appearing to be using illicit drugs." Cathy Houston (Houston), a

DCFS caseworker, interviewed Teagan, who openly admitted that during the pregnancy, she had

used marijuana and any other illicit drug offered to her. Teagan reported that she was unaware that

she was pregnant, and that was why she received no prenatal care. DCFS offered Teagan intact

family services.

¶ 7      Houston testified at the October 25, 2022, shelter care hearing and confirmed that M.-A.S.

suffered withdrawal symptoms after birth which required a three-week hospital stay. M.-A.S. was

discharged on October 21, 2022, and went home with Teagan and Rako. The weekend following

_____

[1]Angel R. was named as M.-A.S.'s biological father, although he never submitted to a DNA test to confirm and is not a party to this case.

M.-A.S.'s discharge, there were reports of Teagan's drug usage with videos and/or photos uploaded on a social media platform. Houston testified about an incident in mid-October that resulted in Teagan's hospitalization at Barnes Hospital in St. Louis, where she tested positive for marijuana and fentanyl.

¶ 8    Houston testified that DCFS took protective custody of M.-A.S. on October 24, 2022, at 10:45 a.m. Houston recommended that the trial court allow Rako to have temporary physical custody of M.-A.S. Houston indicated that she had no safety concerns about Rako and that Teagan's visitation with the child should be supervised. Finally, she stated that she believed there was an immediate and urgent necessity for the removal of M.-A.S. from Teagan's home to prevent risk of harm based upon her continued use of fentanyl, and that it was in the best interest of M.-A.S. to be placed in the temporary legal custody of DCFS. Following the October 25, 2022, hearing, the trial court found that there was an immediate and urgent necessity to remove M.-A.S. from Teagan's home and granted DCFS's petition for temporary custody.

¶ 9    On November 18, 2022, a caseworker visited Rako's home to check on M.-A.S. Teagan answered the door while wearing pajamas. The caseworker left the home and returned later with police officers to remove M.-A.S. from Rako's home. M.-A.S. was then placed in a traditional foster home. On December 1, 2022, Rako filed a motion for leave to intervene arguing that since M.-A.S. lived in her home from October 21, 2022, until November 18, 2022, she was a necessary party because her presence was required in the case to protect her interests relative to M.-A.S.

¶ 10    On February 13, 2023, the State filed a motion objecting to Rako's petition to intervene, arguing that she was not a necessary party. The State cited to section 1-5(1) of the Juvenile Court Act of 1987 (Act), which provides: "the minor who is the subject of the proceeding and the minor's parents, guardian, legal custodian or responsible relative who are parties respondent have the right

3

to be present, to be heard, to present evidence material to the proceedings, to cross-examine witnesses, [and] to examine pertinent court files and records" to a proceeding instituted under the Act. 705 ILCS 405/1-5(1) (West 2022). The State argued that Rako was not a "guardian," although she had filed a separate petition for guardianship; she was not a "legal custodian"; and she was not a "responsible relative" and, thus, could not be a party respondent. The State noted that Rako did not assert that she was a legal custodian, and that she did not meet the definition of the term "responsible relative" as outlined by our Illinois Supreme Court in *In re Jennings*, 68 Ill. 2d 125, 130 (1977) (stating that the term "responsible relative" applies to two categories of individuals: (1) the individual who was a person having custody and control of the minor or (2) the individual who was the nearest known relative and a parent or guardian could not be found). The State asserted that at best Rako could be deemed a former responsible relative, and if so, would have the right to be heard by the court but could not become a party to the proceeding. 705 ILCS 405/1-5(2)(a) (West 2022). Finally, the State argued that Rako had no right to intervene because she only had temporary custody of M.-A.S. in her placement within the intact family case. Moreover, during that brief period, Teagan was often found at the same household with Rako, and thus, she did not meet the definition of "responsible relative" set forth in *In re Jennings. Id.*

¶ 11    On February 14, 2023, the trial court held a hearing on Rako's motion for leave to intervene. Rako testified that she was 52 years of age, was Teagan's biological mother, and a licensed clinical social worker. She testified that before M.-A.S. was discharged from the neonatal intensive care unit, she had a conversation with Cathy Houston of DCFS, who allowed M.-A.S. to be discharged to Teagan and Rako if the child was in Rako's care. On the date of M.-A.S.'s hospital discharge, Rako filed a separate petition for guardianship.[2] Between October 18, 2022, and

---

[2]This case was filed as St. Clair County case No. 22-GR-239, which has been closed.

November 18, 2022, M.-A.S. lived in Rako's Belleville home. Rako testified that Teagan moved out on or about October 25, 2022, when the trial court entered the temporary custody order. Rako stated that Teagan did not have a permanent place to stay, and she moved around a bit. On November 18, 2022, Rako had asked Teagan and Teagan's sister, Quinn, to come over to the house to go grocery shopping with her and M.-A.S. Rako stated that while she was getting ready, the DCFS representatives arrived at the house. Teagan informed Rako upon their arrival, and Rako asked Teagan to explain that she was getting the baby ready but would speak to them soon. Approximately four minutes later, she and the baby were ready, but the DCFS workers had left.

¶ 12    Rako testified that her goal was to obtain guardianship over the child, stating that both Teagan and the baby's father had agreed. Moreover, Teagan was going to sign over her parental rights to Rako so she could adopt M.-A.S. She testified that she had developed a bond with M.-A-S. in the approximate 30 days that the baby was in her care. On cross-examination, Rako specified that she was the first placement for M.-A.S. and confirmed that Teagan was allowed to live with her and M.-A.S. until the temporary custody order was entered. Rako confirmed that she worked in person at Live Well Counseling Services and online with BetterHelp. Earlier in her career, she had worked for two contractors who worked with DCFS and so she was familiar with the processes.

¶ 13    Rako's attorney also called Quinn, Teagan's sister, who testified that she never saw Teagan alone with M.-A.S. She testified that she and Teagan arrived at Rako's home at about 7:45 a.m. on November 18, 2022, and had not spent the night at Rako's home.

¶ 14    The State called Brittney Griffin, who testified that she was employed by Hoyleton Youth and Family Services as a foster care case manager. She confirmed that Rako was the first placement for the baby and was designated as a custodial placement of the minor with DCFS

approval. As a condition to Rako being M.-A.S.'s custodian, Teagan had to be absent from the home. Griffin also testified that there had been three anonymous hotline calls about M.-A.S. and Rako but provided no details about these calls.

¶ 15    On cross-examination by Rako's attorney, Griffin testified that Hoyleton Youth and Family Services made the discretionary decision to remove M.-A.S. from Rako's care. On November 18, 2022, when she initially arrived at Rako's home, she waited approximately 45 minutes before departing. The first 20 minutes, they knocked on the front door of Rako's home with no answer. When the door was opened, they were brought inside only to wait an additional 15 to 20 minutes. Upon returning that same date with law enforcement, she attempted to speak with Rako, but Rako "did not want to hear what we were saying." Without reciting any reasons on the record or in its written order, the trial court granted Rako's motion to intervene.

¶ 16    On April 18, 2023, Rako filed a petition for temporary custody stating that she was a "responsible relative" in that she was the biological maternal grandmother; she was capable, willing, and able to care for the child, and had demonstrated that ability; and she had developed a relationship with the child during the month that the child was in her care. She argued that it was in M.-A.S.'s best interest to award her temporary and permanent custody. Alternatively, she asked the court to award her grandparent visitation.

¶ 17    On April 25, 2023, the trial court held the adjudicatory hearing. Teagan stipulated to the State's petition that M.-A.S. was neglected or abused in that she was born with a controlled substance in her blood, urine, or meconium, and was in an environment that was injurious to her welfare. The court entered its order finding that the allegations in the State's petition had been proven by the preponderance of the evidence.

¶ 18    The dispositional hearing was held on October 24, 2023, at which time the trial court also heard Rako's petition for temporary custody. The State called Terra Dennis, a Hoyleton Youth and Family Services caseworker, to testify. Teagan and Rako both testified.

¶ 19    Terra Dennis (Dennis) testified to the services that DCFS required Teagan to complete and stated that Teagan had not engaged in any of them. Teagan also did not have any visits with M.-A.S. from March 20, 2023, until September 25, 2023. From September 25, 2023, until the date of the hearing, Dennis testified that Teagan participated in two visits and missed two visits. She submitted to a drug test on September 25, 2023, which was positive for fentanyl. Teagan failed to appear for all other scheduled tests. Teagan recently provided Dennis with a new Missouri address, stating that she had moved in with her boyfriend and his mother, which Dennis had not had an opportunity to confirm. Her permanency recommendation remained to return M.-A.S. home to Teagan in 12 months.

¶ 20    Teagan testified that on the date when DCFS removed M.-A.S. from her mother's home, she did not physically live there. She testified that she did not answer the door because the neighborhood was "weird," and it was early in the morning. She answered the door after about 10 minutes and left the DCFS workers in the kitchen for 5 to 7 minutes while she went upstairs to notify her mom. She was present at Rako's house when DCFS returned and removed M.-A.S. Teagan stated that she had not spent the night at her mother's home since August 2023.

¶ 21    Rako next testified that she was seeking custody of M.-A.S. When M.-A.S. was released from the hospital, she was released into Rako's care. As DCFS only had an intact family case open at that time, Teagan was allowed to live with Rako and M.-A.S. Rako testified that because of a couple of social media posts made by Teagan, DCFS initiated the shelter care process. Rako stated that she never allowed Teagan to care for M.-A.S. Between the October 25, 2022, shelter care

7

hearing and November 18, 2022, when DCFS removed M.-A.S. from Rako's home, DCFS made one visit to her home. Rako testified that on November 18, 2022, Teagan told her that DCFS workers were in the kitchen. Rako told Teagan to tell them that she would come downstairs to speak with them after she finished changing and dressing M.-A.S. Rako testified that she headed downstairs within approximately five to six minutes after Teagan informed her of their presence, but by then, they were gone. She texted the caseworker to ask if everything was "okay," but never received a response.

¶ 22    On October 25, 2023, the State filed its response to Rako's April 2023 motion seeking temporary custody of M.-A.S. The State's response was also intended as its closing argument to the dispositional hearing. Noting that DCFS had been granted both guardianship and custody, the State asserted that only DCFS had the right to determine where the child is placed. 705 ILCS 405/1-3(8), (9) (West 2022). The State contended that other sections of the Act prohibited the trial court from ordering specific placements, services, or service providers, unless otherwise authorized by law. *Id.* §§ 2-23(3), 2-28(2).

¶ 23    On November 6, 2023, Rako filed her written closing argument to the dispositional hearing, contending that the trial court had the power to determine in whose custody the minor should be placed and that the court could select any of the options listed in section 2-27(1) of the Act. She specifically argued that the court had the option of placing M.-A.S. in the custody of a person not the parent of the minor. *Id.* § 2-27(1)(a). She asked the court to (1) declare M.-A.S. a ward of the court; (2) to find that Teagan is unfit, unwilling, or both; and (3) place M.-A.S. with Rako.

¶ 24    On December 22, 2023, the trial court entered its orders. The court denied Rako's request that she be awarded permanent custody and guardianship of M.-A.S. and stated that Teagan "should have the opportunity to work on her Service Plan before a goal of guardianship would be

8

considered." The trial court adjudicated M.-A.S. as neglected, made her a ward of the court, placed custody with Rako as a suitable relative, and placed guardianship with DCFS.

¶ 25   On December 27, 2023, DCFS filed an emergency motion to reconsider the December 22, 2023, dispositional order. DCFS argued that the dispositional order stripped DCFS of legal custody of M.-A.S. and improperly restricted DCFS's statutory authority to make placement decisions. Stated alternatively, DCFS argued that the trial court made a specific placement, which it lacked the authority to do. After a hearing on January 4, 2024, the trial court took the motion under advisement, and on February 16, 2024, the trial court granted the motion to reconsider and placed custody of M.-A.S. with DCFS.

¶ 26   Following a motion to clarify filed by Rako, the trial court entered an explanatory order on March 4, 2024, stating it agreed with DCFS that the trial court did not have the authority to grant guardianship to DCFS and custody to another individual because the trial court would then have made a specific placement, which the Act did not authorize.

¶ 27                                II. ANALYSIS

¶ 28   The narrow issue before us is whether the trial court has the authority to place custody of a minor child with a relative while at the same time awarding guardianship of the minor to DCFS. On appeal, DCFS contends that custody and guardianship cannot be split in this way. While the State agreed with DCFS's position in the trial court proceeding, the State has now determined that its original position was incorrect, and the trial court did have the authority to split guardianship and custody.

¶ 29   Our review is *de novo*. *In re M.M.*, 2016 IL 119932, ¶ 15; *Horlacher v. Cohen*, 2017 IL (1st) 162712, ¶ 80. In reviewing statutory language, the primary rule of statutory construction is to ascertain and give effect to the intent of the legislature. *In re M.M.*, 2016 IL 119932, ¶ 16;

9

*Hawkins v. Voss*, 2015 IL App (5th) 140001, ¶ 12. We determine legislative intent by giving the language chosen its plain and ordinary meaning. *Hawkins*, 2015 IL App (5th) 140001, ¶¶ 12-13. In reviewing statutory language, we must not consider words and/or phrases in isolation but must construe these words and/or phrases in the context of other relevant statutory provisions. *In re M.M.*, 2016 IL 119932, ¶ 16. We must read the statute in its entirety and not consider a word, clause, or sentence to be irrelevant. *Id.* Moreover, we should not read into a statute any exceptions, limitations, or conditions that the legislature did not specifically state. *Elam v. Municipal Officers Electoral Board for Village of Riverdale*, 2021 IL 12780, ¶ 14. In addition, "[o]ne of the fundamental principles of statutory construction is to view all provisions of an enactment as a whole." *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 504 (2000).

¶ 30    Our Illinois Supreme Court has stated that "a court exercising jurisdiction over a minor pursuant to the provisions of the Act is not at liberty to reject or embellish its statutory authority even if there is a perceived need or desirability for such action." *People ex rel. Devine v. Stralka*, 226 Ill. 2d 445, 454 (2007). DCFS argues that the trial court did not have the statutory authority to give Rako custody of M.-A.S. after granting DCFS guardianship, because this constituted a "specific placement," which is prohibited under section 2-23 of the Act. That section states: "Unless otherwise specifically authorized by law, the court is not empowered under this subsection (3) to order specific placements, specific services, or specific service providers to be included in the plan." 705 ILCS 405/2-23(3) (West 2022).

¶ 31    Here, following its dispositional order, the trial court had five options for placement of M.-A.S. pursuant to section 2-27 of the Act: (1) place the minor in the custody of a suitable relative or other person as legal custodian or guardian; (2) place the minor in the subsidized guardianship or a suitable relative or other person as legal guardian; (3) place the minor under the guardianship

10

of a probation officer; (4) commit the minor to an agency that is not DCFS (or under DCFS's authority) for care and placement; or (5) commit the minor to DCFS for care and service (subject to specific limitations that are not relevant to this case). *Id.* § 2-27(1)(a)-(d). When a minor is placed pursuant to section 2-27 of the Act, the trial court "may choose only among the dispositional alternatives provided in the statute and 'may not exceed [its] statutory authority no matter how desirable or beneficial the attempted innovation might be.' " *In re P.F.*, 265 Ill. App. 3d 1092, 1104 (1994) (quoting *In re Peak*, 59 Ill. App. 3d 548, 551-52 (1978)).

¶ 32    We find *In re T.L.C.*, 285 Ill. App. 3d 922, 924 (1996), instructive. There, the trial court appointed the guardianship administrator of DCFS as the minor's "guardian with power to place." The trial court also ordered DCFS to place the minor in a specific residential facility. *Id.* The appellate court recognized that the Act technically would allow the court to split guardianship and custody of a minor, except when guardianship is placed with DCFS, because the Act "does not permit the court to dictate to DCFS exactly where custody must be placed." *Id.* at 926. Upon reviewing the entirety of the Act, the court noted that "the legislature intended that the circuit court not be empowered to order specific services." *Id.* at 929. In reversing the trial court's dispositional order directing DCFS to place the minor in a specific residential facility, the appellate court stated that although section 2-27(1)(c) seemingly allows the court to "commit [the minor] to an agency for care or placement," the court may not do so after appointing DCFS as the minor's guardian because the duties outlined in the definitions of "guardianship of the person" and "legal custody" in section 1-3 of the Act are limited by the guardian's rights and responsibilities. *Id.* at 925-26 (citing 705 ILCS 405/2-27(1)(c), 1-3(8)(c), 1-3(9)).

¶ 33    In its analysis, the court in *In re T.L.C.* relied upon an earlier case—*In re Chiara C.*, 279 Ill. App. 3d 761 (1996). In *In re Chiara C.*, guardianship of the minor had been placed with DCFS.

11

*Id.* at 763. DCFS then placed custody of the minor in a relative placement. *Id.* At a hearing on Chiara's emergency motion to change placement, the trial court entered an order directing DCFS to remove the minor from her relative placement and move her to a licensed residential facility for college-bound students. *Id.* On appeal, the court reversed the trial court's placement order stating that the court's order directing DCFS to change Chiara's placement was an order for a specific service that was not authorized by the Act. *Id.* at 767. The court also noted that Chiara was in DCFS custody pursuant to section 2-27(1)(d) in that she was committed to DCFS for care and service. *Id.* at 766-67 (quoting 705 ILCS 405/2-27(1)(d) (West 1994)). In support, the appellate court cited section 2-28(2) of the Act: " 'Unless otherwise specifically authorized by law, the court is not empowered *** to order specific services or service providers to be included in the plan.' " (Emphasis omitted.) *Id.* at 765-66 (quoting 705 ILCS 405/2-28(2) (West 1994)).

¶ 34    Rako argues that while DCFS had guardianship of M.-A.S., DCFS did not explicitly have guardianship "with the right to place" as the trial judge had ordered in *In re T.L.C.* We disagree with this argument and find that the trial court implicitly gave DCFS the power to place M.-A.S. by placing her under DCFS's guardianship. Moreover, in its own administrative regulations, DCFS has the legal authority to place a child when it has obtained custody or guardianship pursuant to the Act. 89 Ill. Adm. Code 301.40(a)(1), (3) (2010).

¶ 35    We conclude that the trial court's original dispositional order which split custody and guardianship was in error. We find that the trial court corrected this error when it granted DCFS's motion to reconsider and entered its subsequent dispositional order, placing both custody and guardianship with DCFS.

¶ 36                                III. CONCLUSION

¶ 37    For the foregoing reasons, we affirm the order of the St. Clair County circuit court.

12

¶ 38    Affirmed.