MICHIGAN AVENUE NATIONAL BANK, as Special Adm'r of the Estate of Cynthia Collins, Deceased, Plaintiff-Appellant, v. THE COUNTY OF COOK *et al.*, Defendants-Appellees (Lisa Ferrill *et al.*, Defendants).

First District (2nd Division) No. 1—98—1974

Opinion filed June 30, 1999.—Rehearing denied August 20, 1999.

Jeffrey M. Goldberg and Michael V. Marsh, both of Jeffrey M. Goldberg & Associates, Ltd., of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Patricia M. Shymanski and Peter D. Fischer, Assistant State's Attorneys, of counsel), for appellees.

Mark Szaflarski, of Joel H. Greenburg, Ltd., of Chicago, for *amicus curie.*

PRESIDING JUSTICE GORDON delivered the opinion of the court:

Plaintiff, Michigan Avenue National Bank, as special administrator of the estate of Cynthia Collins, deceased, filed a medical malpractice lawsuit against the County of Cook, a body politic; Cook County Hospital; Barbara Weiss, M.D.; Mohammed Ali, M.D.; Mary LeBlanc, R.N.; Lisa Ferrill, R.N.; and Irma Garcia, R.N. Four years after the lawsuit was filed, the defendants moved for summary judgment, contending that they were immune from liability under sections 6—105 and 6—106 of the Local Governmental and Governmental Employees Tort Immunity Act (the Tort Immunity Act) (745 ILCS 10/6—105, 6—106 (West 1992)). While that motion was pending, Ferrill and Garcia were voluntarily dismissed as defendants. Thereafter, the trial court granted summary judgment to the remaining defendants. The plaintiff appeals, arguing that the defendants were not immune from liability. For the reasons discussed below, we affirm the grant of summary judgment in defendants' favor.

## BACKGROUND FACTS

Plaintiff's two-count complaint sought recovery for damages resulting from the negligence of the defendants. Count I was brought pursuant to the Wrongful Death Act (Ill. Rev. Stat. 1985, ch. 70, par. 1 *et seq.* (now 740 ILCS 180/1 *et seq.* (West 1996))), and count II was brought pursuant to the Survival Act (Ill. Rev. Stat. 1985, ch. 110½, par. 27—6 (now 755 ILCS 5/27—6 (West 1996))). Both counts alleged that defendants were negligent in the following manner:

"a. Failed to order a mammogram when a lump was palpated in decedent's left breast;

b. Failed to properly and adequately perform examinations and tests on decedent;

c. Failed to perform a biopsy when a lump was palpated in decedent's left breast;

d. Failed to diagnose decedent's condition of breast cancer; and

e. Failed to administer proper, appropriate and necessary medical and nursing care and attention to the decedent."

The section 2—622(a)(1) affidavit (735 ILCS 5/2—622(a)(1) (West 1992)) attached to plaintiff's complaint opined that the defendants "negligently failed to perform a mammogram and/or an immediate biopsy of the lump in [Collins'] left breast, given her family history of breast cancer and her presentation to these Cook County Hospital physicians and health care providers with a lump in her left breast."

The facts established by the deposition testimony of plaintiff's experts attached to defendants' motion for summary judgment and the exhibits attached to plaintiff's response to defendants' motion and plaintiff's motion to reconsider and vacate the summary judgment[1] showed that Collins made several visits between September 22, 1986, and February 10, 1987, to Cook County Hospital and the Fantus Clinics operated by Cook County Hospital. Collins visited the Fantus Family Planning Clinic on September 22, 1986, when she was 22 years old. On that date, nurse Lisa Ferrill performed a routine breast examination and palpated a lump in Collins' left breast. The clinician form completed by Ferrill described the lump as "soft, non-tender, 2 x 3 cm, cystic mass." Ferrill referred Collins to Cook County Hospital's breast

---

[1]The exhibits attached to plaintiff's response to defendants' motion for summary judgment related to Collins' September 22, 1986, and October 22, 1986, visits. Those exhibits as well as copies of medical reports dated December 19, 1986, December 29, 1986, January 22, 1987, and February 10, 1987, were attached to plaintiff's motion to reconsider. All of these exhibits were discussed in the deposition testimony of plaintiff's experts, the transcripts of which were attached to defendants' summary judgment motion.

Defendants' reply to plaintiff's response noted plaintiff's failure to corroborate many factual assertions in its response with deposition transcripts or medical records. Defendants did not, however, specifically dispute the factual allegations in plaintiff's response. Moreover, while argument could be made that the medical records attached to plaintiff's motion to reconsider should not be considered in ruling on the propriety of defendants' summary judgment motion (see *Soderlund Brothers, Inc. v. Carrier Corp.*, 278 Ill. App. 3d 606, 663 N.E.2d 1 (1995) (trial court has discretion to refuse to consider new evidence presented in motion for reconsideration when that evidence was available and party had ample time to present it to the court)), the defendants have not made any such objection. As discussed, the medical records exhibits were referenced in the depositions of plaintiff's experts, the transcripts of which were used to support defendants' summary judgment motion; and those are the records that show the actions taken by the various defendants.

clinic. On the "Consultation Request Form," also completed by Ferrill on that date, Ferrill requested that the mass in Collins' left breast be evaluated. This form noted that Collins' mother died of breast cancer. On October 22, 1986, Collins went to the breast clinic and was examined by nurse Mary LeBlanc. LeBlanc's report, signed by Le-Blanc and initialed by an unidentified doctor, indicated that Collins had been referred from the family planning clinic because of a left breast mass. That report also indicated that Collins' mother had breast cancer. It described Collins' breast condition as "bilateral nodularity, no definite masses, nodes, positive left axillary lymph node—freely movable, negative nipple discharge." According to the report, Collins was instructed to return to the breast clinic in January 1987, three months later. No evidence was presented to show that Collins returned to the breast clinic as instructed. In fact, questioning of plaintiff's experts during the taking of their depositions suggests the contrary.

Collins was seen in the emergency department at Cook County Hospital on December 19, 1986, complaining of missed menstrual period, abdominal pain and sore breasts. She was examined by Doctor Albion, who was not named as a defendant in the instant action. Collins returned to the emergency department on December 29, 1986, complaining of abdominal cramps and vaginal discharge, and was again examined by Albion. On January 22, 1987, Collins visited the prenatal clinic of Cook County Hospital complaining of vaginal discharge and suffering from a threatened spontaneous abortion. The history and physical examination portion of the report completed by Doctor Barbara Weiss, an obstetrician/gynecologist and defendant herein, indicated that Collins had fibrocystic disease of the breast and that Collins had a cyst in her inner, mid-right breast. The diagnosis portion of the report showed "11-12 wks gestation" and indicated that Collins was advised to have bed rest and drink fluids. Collins returned to the Fantus Health Center on February 10, 1987, and was examined by Doctor Mohammed Ali, another defendant. Doctor Ali's "Progress Notes" indicated that Collins had had a "D&C" on January 26, 1987, and that she had been suffering from vaginal discharge, cramps and sharp breast pain. Ali's report indicated the performance of a pelvic examination, a finding that Collins' breasts were "within normal limits," and a recommendation that Collins return to the gynecological clinic in one year.

Collins became pregnant in August 1987 and sought medical care at MacNeal Hospital/Rush Presbyterian (MacNeal) through her employer's insurance plan. Collins delivered a child in May 1988. In July 1988, a lump in Collins' left breast was diagnosed at MacNeal to be cancerous and it was determined there that the cancer had spread

to her arm and neck area. A mastectomy was performed at MacNeal on July 18, 1988, followed by radiation and chemotherapy. Collins died of breast cancer at the age of 25 on November 22, 1989.

In their motion for summary judgment, premised on their affirmative defense of tort immunity, the defendants did not dispute the plaintiff's allegations concerning Collins' multiple visits to Cook County Hospital and its various clinics between the period of September 22, 1986, to February 10, 1987. For purposes of their motion, they did not dispute the fact that a lump was found in Collins' left breast on September 22, 1986; that Collins had breast cancer on or before October 22, 1986; that Collins suffered from fibrocystic disease on or before October 22, 1986; that there was a failure to diagnose Collins' cancer on October 22, 1986; or that the failure to diagnose between October 1986 to January 1987 was the proximate cause of Collins' death. The defendants also did not dispute the deposition testimony of plaintiff's expert, Doctor Larry S. Miller, that the standard of care was breached by Doctor Ali based upon Miller's belief that Ali failed to perform a breast examination in February 1987; by Doctor Weiss when she felt a cyst and failed to schedule a surgical clinic visit; and by nurse LeBlanc for failure to consult with a physician (assuming she had failed to do so) and failure to request a mammogram, ultrasound, or biopsy or to instruct Collins to return in four to six weeks for reassessment. Finally, the defendants did not dispute the deposition opinion testimony of Doctor Joseph E. Russ, plaintiff's second expert, that the unnamed physician involved in Collins' October 22, 1986, visit deviated from the standard of care by failing to do anything to diagnose the breast cancer, such as ordering a mammogram or biopsy and by instructing Collins to return in three months, and that nurse LeBlanc deviated from the standard of care if she didn't discuss her examination findings with a breast surgeon. The defendants argued that they were immune from liability in accordance with section 6—106(a) of the Tort Immunity Act, which immunizes local public entities and public employees from liability resulting from diagnosing or failing to diagnose. 745 ILCS 10/6—106(a) (West 1992). Defendants further argued that, assuming they performed inadequate examinations upon Collins, they were immune from liability regarding those actions in accordance with section 6—105 of the Tort Immunity Act, which immunizes local public entities and public employees from the "failure to make a physical *** examination, or to make an adequate physical *** examination." 745 ILCS 10/6—105 (West 1992).

In response, the plaintiff argued that defendants' liability was premised on "more than mere 'failure to diagnose.' " It argued that the defendants were liable for "making a faulty diagnosis of fibrocystic

breast disease which resulted in Defendants [sic] failure to preform [sic] the appropriate medical diagnostic tests necessary to determine the actual nature of Plaintiff's breast disease, i.e., early stage breast cancer." It contended that the "misdiagnosis of fibrocystic breast disease arrived at through the negligence of the Defendants resulted in a failure to provide the early surgical intervention that probably would have saved Cynthia Collins' life." The plaintiff alternatively argued that, even if the defendants were immune under the Tort Immunity Act, they were liable under the "special relationship" exception to the Tort Immunity Act.

## DISCUSSION

■ Summary judgment is proper where the pleadings, depositions, admissions of record and affidavits show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 1996); *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 586 N.E.2d 1211 (1992); *Alcan United, Inc. v. West Bend Mutual Insurance Co.*, 303 Ill. App. 3d 72, 707 N.E.2d 687 (1999). Appellate review of an order granting summary judgment is *de novo*. *E.g., Apostal v. Oliveri Construction Co.*, 287 Ill. App. 3d 675, 678 N.E.2d 756 (1997).

As discussed, the defendants in the instant case did not dispute the facts alleged by the plaintiff or the opinions of the plaintiff's experts. The defendants contended that, even assuming those facts and opinions, they were immune from liability under sections 6—105 and 6—106(a) of the Tort Immunity Act. The accuracy of the latter contention requires review and interpretation of those statutory provisions.

■ The Tort Immunity Act (745 ILCS 10/1—101 *et seq*. (West 1992)) is the legislative response to *Molitor v. Kaneland Community Unit District No. 302*, 18 Ill. 2d 11, 163 N.E.2d 89 (1959), wherein the "court effectively abolished the long-standing common law doctrine of municipal immunity for tort liability," and *Harvey v. Clyde Park District*, 32 Ill. 2d 60, 203 N.E.2d 573 (1964), wherein the court "noted the constitutional deficiency of certain legislation[ ] enacted in response to *Molitor*." *Aikens v. Morris*, 145 Ill. 2d 273, 277, 583 N.E.2d 487, 490 (1991); accord *Dewitt v. McHenry County*, 294 Ill. App. 3d 712, 717, 691 N.E.2d 388, 391-92 (1998). The Tort Immunity Act "is an attempt to create certain uniform rules of immunity as exceptions to the general rule of municipal liability recognized in *Molitor*." *Aikens*, 145 Ill. 2d at 277-78, 583 N.E.2d at 490; see *Barnett v. Zion Park District*, 171 Ill. 2d 378, 386, 665 N.E.2d 808, 812 (1996) (the Tort Immunity Act codifies duties existing at common law and delineates

governmental immunities that apply to those duties); *Lloyd v. County of Du Page,* 303 Ill. App. 3d 544, 707 N.E.2d 1252 (1999) (governmental units are liable in tort unless the statutory conditions for tort immunity exist). As the Tort Immunity Act is in derogation of common law actions against local public entities, it must be strictly construed against the public entity involved. *Aikens,* 145 Ill. 2d at 277-78, 583 N.E.2d at 490; *Dewitt,* 294 Ill. App. 3d at 717-18, 691 N.E.2d at 392.

■ In construing language in the Tort Immunity Act, our supreme court has stated: .

> "[O]ur primary goal is to ascertain and give effect to the intention of the legislature. We seek the legislative intent primarily from the language used in the Tort Immunity Act. We evaluate the Act as a whole; we construe each provision in connection with every other section. See *Abrahamson v. Illinois Department of Professional Regulation,* 153 Ill. 2d 76, 91, 606 N.E.2d 1111 (1992). If we can ascertain the legislative intent from the plain language of the Act itself, that intent must prevail, and we will give it effect without resorting to interpretive aids. See *Envirite v. Illinois Environmental Protection Agency,* 158 Ill. 2d 210, 216-17, 632 N.E.2d 1035 (1994). We must not depart from the plain language of the Act by reading into it exceptions, limitations, or conditions that conflict with the express legislative intent. See *Kraft, Inc. v. Edgar,* 138 Ill. 2d 178, 189[, 561 N.E.2d 656] (1990)." *Barnett,* 171 Ill. 2d at 388-89, 665 N.E.2d at 813.

Accord *Harinek v. 161 North Clark Street Ltd. Partnership,* 181 Ill. 2d 335, 692 N.E.2d 1177 (1998).

■ Section 6—105 of the Tort Immunity Act, captioned in the Illinois Compiled Statutes as "Preventive physical or mental examination of the persons," provides immunity to local public entities and public employees who have failed to make a physical or mental examination or failed to make an adequate physical or mental examination. It states:

> "Neither a local public entity nor a public employee acting within the scope of his employment is liable for injury caused by the failure to make a physical or mental examination, or to make an adequate physical or mental examination of any person for the purpose of determining whether such person has a disease or physical or mental condition that would constitute a hazard to the health or safety of himself or others." 745 ILCS 10/6—105 (West 1992).

Relying on the caption to this provision, the plaintiff argues that section 6—105 immunizes only those public health care entities and professionals who perform preventive public health examinations to the public at large, not those entities and individuals, such as the defendants, who perform a medical examination for an individual with

a specific medical condition. As further support for that contention, the plaintiff cites to California case law applying California tort immunity legislation said to be similar to the Illinois Tort Immunity Act. See J. Latturner, *Local Governmental Tort Immunity and Liability in Illinois*, 55 Ill. B.J. 28 (1966). We disagree with plaintiff's argument as well as its reliance on California law.

The immunity provided in section 6—105 is not limited to preventive public health examinations even though the term "preventive" appears in the caption of that section in the West edition of the Illinois Compiled Statutes. Although not discussed by the parties to this appeal, it is common knowledge that that publication is an unofficial statutory compilation which often includes section titles or headings added by the publisher. It is also common knowledge that when the legislature enacts section titles, the section title will follow the section number of the act. If the legislature has not enacted a section title, the inclusion of a section title by the publisher of an unofficial statutory compilation can be of no import in construing the section. *Greater Peoria Sanitary & Sewage Disposal District v. Baise*, 234 Ill. App. 3d 622, 626, 600 N.E.2d 75, 78 (1992) ("the caption supplied by the publisher of the Illinois Revised Statutes is not part of the official title or contents of the statute and the heading cannot alter the plain meaning of the substantive language"). Section 6—105, as enacted, did not contain a title or heading (see 1965 Ill. Laws 2991), nor did any sections within the official version of the Tort Immunity Act contain titles or headings (see 1965 Ill. Laws 2982-96). Section 6—105 has never been amended by the legislature to include such a heading. Thus, although the parties have not discussed the source of the caption, it would appear that the caption "Preventive physical or mental examination of persons" was added by the publisher; and, as a result, that caption would be of no relevance in construing section 6—105. See *Baise*, 234 Ill. App. 3d at 626, 600 N.E.2d at 78.

Moreover, even if the inclusion of the term "preventive" in the caption had official significance, that fact still would not warrant plaintiff's interpretation and limitation of the immunity provided in section 6—105 only to preventive physical examinations. The heading of a statutory section cannot limit the plain meaning of the text; it cannot undo or limit that which the text makes plain. *Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528-29, 91 L. Ed. 1646, 1652, 67 S. Ct. 1387, 1392 (1947). The official heading or title of a statute can only provide guidance in interpreting an ambiguous provision. *Dewitt*, 294 Ill. App. 3d at 716, 691 N.E.2d at 391; *People v. Lamb*, 224 Ill. App. 3d 950, 953, 587 N.E.2d 61, 63 (1992). It is a tool for the resolution of doubt with respect to an ambiguous word or

phrase within the text. *Brotherhood of R.R. Trainmen*, 331 U.S. at 529, 91 L. Ed. at 1652, 67 S. Ct. at 1392. The title of the act may not, however, "be used as a means of creating an ambiguity when the body of the act itself is clear." 2A N. Singer, Sutherland Statutory Construction § 47.03, at 140 (5th rev. ed. 1992).

Here, there is no ambiguity in the text of section 6—105. That text is broad in scope and immunizes local public entities and public employees who fail to make or who make inadequate physical or mental examinations for purposes of determining whether a person suffers from a disease or physical or mental condition. There is no language in section 6—105 limiting its scope to preventive public health examinations. *Cf.* 745 ILCS 10/6—104 (West 1996) (providing immunity for acts or omissions relative to the "promot[ion of] the public health of the community"). Only the title to section 6—105 would create an ambiguity as to the scope of the immunity; but, as stated above, the title to a statute cannot be used to create an ambiguity or to alter the plain words of the statute. *Brotherhood of R.R. Trainmen*, 331 U.S. at 528-29, 91 L. Ed. at 1652, 67 S. Ct. at 1392; *Lamb*, 224 Ill. App. 3d at 953-54, 587 N.E.2d at 63-64; 2A N. Singer, Sutherland Statutory Construction § 47.03, at 140 (5th rev. ed. 1992). Thus, given the plain language of the text of section 6—105, tort immunity exists with respect to any physical or mental examination, whether preventive or for purposes of treatment.

Plaintiff's reliance on California law also is of no avail. The California statutory provision which the plaintiff contends is analogous to section 6—105 because it, too, provides immunity for failing to make or for the making of an inadequate physical or mental examination is not identical to section 6—105. Unlike section 6—105, section 855.6 of the California Government Code begins with the exclusionary phrase "Except for an examination or diagnosis for the purpose of treatment ***." Cal. Gov't Code § 855.6 (Deering 1982). That provision expressly excludes from immunity protection the failure to make or the making of an inadequate physical or mental examination for the purpose of diagnosis or treatment. See Cal. Gov't Code § 855.6, Law Revision Comm'n Comments, at 352 (Deering 1982) (stating section 855.6 "does not apply to examinations for the purpose of treatment such as made in doctors' offices and public hospitals"). See also *Smith v. County of Kern*, 20 Cal. App. 4th 1826, 25 Cal. Rptr. 2d 716 (1993) (finding section 855.6 did not immunize public hospital from liability for negligent failure to test a particular individual's blood sample to assist in the diagnosis of AIDS). Unlike California's section 855.6, section 6—105 of the Illinois Tort Immunity Act does not contain textual language excluding from immunity "examination or diagnosis for the purpose

of treatment." This distinction is critical and precludes any analogy between the two statutes.

■ Plaintiff next contends that the trial court erred in finding the defendants immune from liability under section 6—106(a) of the Act rather than finding them liable in accordance with section 6—106(d). Section 6—106 of the Tort Immunity Act provides in pertinent part:

> "(a) Neither a local public entity nor a public employee acting within the scope of his employment is liable for injury resulting from diagnosing or failing to diagnose that a person is afflicted with mental or physical illness or addiction or from failing to prescribe for mental or physical illness or addiction.
>
> * * *
>
> (d) Nothing in this section exonerates a public employee from liability for injury proximately caused by his negligent or wrongful act or omission in administering any treatment prescribed for mental or physical illness or addiction or exonerates a local public entity whose employee, while acting in the scope of his employment, so causes such an injury." 745 ILCS 10/6—106(a), (d) (West 1992).

In reliance on subsection (d), the plaintiff argues that once treatment of a medical condition has been undertaken, a failure to properly diagnose and treat that medical condition is negligence for which tort immunity under subsection (a) does not apply.

Plaintiff's interpretation of subsection (d), extending liability for diagnostic errors once treatment is undertaken, would appear to irreconcilably conflict with the plain language of subsection (a), which grants immunity from liability for injury resulting from diagnosing or failing to diagnose a mental or physical illness or addiction as well as from failing to prescribe medical treatment for that illness or addiction. It also would seem to contravene logic, since treatment of a medical condition cannot be undertaken unless or until a medical condition is diagnosed and unless the diagnosed medical condition warrants treatment. Argument could be made, however, that once diagnosis of a medical condition is made and treatment of that condition is prescribed and undertaken, any subsequent diagnosis required to be made as a result of that treatment, such as with respect to complications arising from medications prescribed or medical procedures performed, may not be entitled to the immunity protection of section 6—106(a). For instance, a medication could be therapeutic for a diagnosed illness but toxic to an undiagnosed illness. Treatment of the former would require the medical professional to inquire as to common conditions of pathology that would be aggravated by the intake of medication prescribed for the diagnosed illness. Treatment of the

diagnosed illness also might require the medical professional to perform further testing when adverse reactions occur as a result of the treatment prescribed for the diagnosed medical condition and to diagnose and treat any additional medical conditions that result. The making of the subsequent diagnosis would become part of the treatment prescribed for the medical condition initially diagnosed; and there would be no immunity if the subsequent diagnosis was incorrectly made (a negligent or wrongful act) or if the diagnosis was not made at all (an act of omission). See 745 ILCS 10/6—106(d) (West 1992) ("[n]othing in this section exonerates *** for injury proximately caused by *** negligent or wrongful act or omission in administering any treatment prescribed"). If, however, a medical professional diagnoses and treats a medical condition but fails to diagnose an independent but coexistent medical condition, and if treating the diagnosed medical condition does not exacerbate the undiagnosed coexistent condition, the medical professional would not be liable for the failure to diagnose the latter condition.

In any event, the liability for treatment recognized in section 6—106(d) is nonexistent in the instant case because the undisputed facts show that no medical treatment had been prescribed or undertaken with respect to Collins' fibrocystic breast condition, and the treatment undertaken with respect to her threatened spontaneous abortion and post-spontaneous abortion conditions did not require diagnosis of the alleged breast cancer. There is no dispute that Collins had and was diagnosed as having fibrocystic disease on September 22, 1986, and October 22, 1986. No evidentiary facts established that fibrocystic disease was treatable or that any of the defendant medical professionals had undertaken treatment of that condition on October 22, 1986. Doctor Russ, plaintiff's expert, stated that fibrocystic disease was a "condition" not a "disease" consisting of cysts and fibrous or dense nodular tissue in the breast. The testimony of Doctors Russ and Miller related only to the failure to make a complete diagnosis, not the commission of negligence in the course of treatment. In that regard both experts testified that nurse LeBlanc and/or the unidentified doctor who initialed the report prepared by LeBlanc deviated from the standard of care on October 22, 1986, when they found an abnormality in Collins' left axillary lymph node and failed to further evaluate that condition by ordering a mammogram, breast ultrasound or breast biopsy and failed to order Collins to return for reassessment of her condition sooner than three months. (Russ and Miller stated that LeBlanc would be liable only if she failed to consult with a breast surgeon or physician concerning her examination findings.) Neither Russ nor Miller testified that the testing and/or reassessment was for

the purpose of treating Collins' fibrocystic condition. Rather, the clear import of their deposition testimony was that the testing and/or reassessment was necessary for the purpose of determining whether in addition to having fibrocystic disease Collins had breast cancer. This determination was diagnostic in nature, not treatment related. See Webster's Third New International Dictionary 622 (1993) (defining "diagnose" as "to identify (as a disease or condition) by symptoms or distinguishing characteristics"). Since the misconduct on October 22, 1986, attributable to LeBlanc and the unidentified doctor was the failure to conduct further diagnostic testing and evaluation to determine whether Collins suffered from breast cancer in addition to fibrocystic condition, and since no medical treatment had been rendered to Collins, section 6—106(a) immunity applied to the acts or omissions that occurred on October 22, 1986.

Similarly, defendant Ali did not render treatment to Collins. Doctor Ali examined Collins in February 1987 for her complaints of vaginal discharge, cramps and breast pain after Collins had suffered a miscarriage and undergone a "D & C" on January 26, 1987. Doctor Russ found no fault with Ali's care of Collins on that date. Miller, on the other hand, opined that Ali deviated from the standard of care by not performing a breast examination in response to Collins' complaint of breast pain. (In his deposition, Miller agreed, however, that Ali's report showed an entry that Collins' breasts were within normal limits. He also indicated that Ali stated in his deposition that he was pretty sure that an examination was done.) Viewed in a light most favorable to the plaintiff, Miller's testimony at best would only attribute misconduct to Ali in failing to examine or to perform an adequate diagnostic examination of Collins' breasts, conduct protected by section 6—105 of the Act.

Treatment was rendered to Collins on January 22, 1987, by Doctor Weiss, who provided emergency medical care for a threatened spontaneous abortion rather than for her breast condition. Weiss prescribed treatment in the form of bed rest and drinking fluids. That treatment was not prescribed as the result of a diagnosis of a breast ailment nor was Collins' breast ailment in any way related to or affected by the treatment prescribed for Collins' pregnancy. In fact, Russ stated that it was not Weiss's role to exam Collins for breast cancer since her focus "was to take care of a woman that was bleeding from a miscarriage." He stated that it would not have been Weiss' role to exam Collins' axilla lymph node. Miller opined, however, that Weiss deviated from the standard of care by failing to refer Collins to the surgical clinic for examination of the cyst found by Weiss in Collins' right breast. Assuming for purposes of summary judgment that

Miller's opinion created a question of fact as to whether Weiss deviated from the standard of care, the fact remains that Weiss' conduct in rendering emergency treatment for a threatened spontaneous abortion did not cause, implicate or aggravate Collins' breast cancer. Since that treatment had no relationship to the breast cancer and would not have required that the breast cancer be detected, Weiss' misconduct, if any, was nothing other than a failure to diagnose, or, as Miller opined, a failure to refer Collins for diagnostic testing, conduct to which section 6—106(a) immunity applies.

■ We also note that the plaintiff's complaint and response to defendants' summary judgment motion belies plaintiff's contention on appeal that the defendants had rendered medical treatment to Collins for her breast condition. As discussed above, the specific allegations in plaintiff's complaint alleged that the defendants were negligent in that they "failed to order a mammogram"; "failed to properly and adequately perform examinations and tests"; "failed to perform a biopsy"; and "failed to diagnose decedent's condition of breast cancer."[2] Similarly, plaintiff's response to defendants' summary judgment motion argued that the defendants were liable for "making a faulty diagnosis of fibrocystic breast disease which resulted in Defendants [sic] failure to preform [sic] the appropriate medical diagnostic tests." It argued that the defendants had "misdiagnosed" fibrocystic breast disease and that that "misdiagnosis" resulted in a failure to provide early surgical intervention. It is clear from these allegations and arguments that even the plaintiff characterized the instant lawsuit as one involving a failure to diagnose.

■ Plaintiff next contends that the trial court erred in granting summary judgment because the court failed to address the issue of whether defendants' acts were ministerial in nature and thus not

---

[2]The plaintiff argues that summary judgment should not have been granted because of the allegation in its complaint that the defendants "failed to administer proper, appropriate and necessary medical care and attention to the decedent." The plaintiff suggests that this allegation raises a question of fact as to whether treatment was rendered to Collins. We disagree. "Even though a complaint and answer may purport to raise issues of material fact, if such issues are not further supported by evidentiary facts through affidavits or such, summary judgment is then appropriate." Bennett v. Raag, 103 Ill. App. 3d 321, 326, 431 N.E.2d 48, 51 (1982); accord Golden v. Marshall Field & Co., 134 Ill. App. 3d 100, 479 N.E.2d 1211 (1985). As discussed in the text of this opinion, there were no evidentiary facts to support plaintiff's contention that any treatment had been rendered to Collins with respect to the diagnosed fibrocystic disease or the undiagnosed breast cancer or that where treatment was rendered, it would have required the diagnosis of Collins' breast cancer.

subject to the public official immunity doctrine. This contention is without any merit. The common law public official immunity doctrine provides that " 'State officials and employees are protected from personal liability for actions taken in the exercise of their official discretion. [Citations.]' " *Janes v. Albergo*, 254 Ill. App. 3d 951, 957, 626 N.E.2d 1127, 1131 (1993), quoting *Hanzel Construction, Inc. v. Wehde & Southwick, Inc.*, 130 Ill. App. 3d 196, 200, 474 N.E.2d 38, 41-42 (1985). The public official immunity doctrine protects only state employees. It has no applicability in the instant case because the defendants are employees of the county, not the State. Thus, any consideration of defendants' conduct under that doctrine would have been superfluous.

■ Finally, plaintiff contends that summary judgment was inappropriate because, notwithstanding the applicability of the Tort Immunity Act, the defendants were liable to Collins under the "special duty" exception to that Act. Since the filing of plaintiff's complaint, which pled a "special duty," our supreme court held in *Harinek*, 181 Ill. 2d at 346-47, 692 N.E.2d at 1183-84, that the "special duty" doctrine could not operate to impose liability when immunity from that liability exists under the Tort Immunity Act. Given our finding that the defendants were immune from liability under sections 6—105 and/or 6—106(a) of the Tort Immunity Act, plaintiff's "special duty" theory of liability must be rejected.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

McNULTY, J., concurs.

JUSTICE COUSINS, dissenting:

In this appeal we decide whether sections 6—105 and 6—106 of the Illinois Tort Immunity Act (745 ILCS 10/1—101 *et seq.* (West 1996)) provide immunity from liability to Cook County Hospital and its employee physicians and nurses when they negligently misdiagnose and fail to treat a specific medical condition of a patient. In my view, in considering this issue, we must be ever mindful that the language of article I, section 12, of the Constitution of Illinois provides: "Every person shall find a certain remedy in the laws for all injuries and wrongs which he receives to his person ***." Ill. Const. 1970, art. I, § 12. Thus, since our Illinois Constitution provides that where there is an injury there is also a remedy under law, it is my view that the provisions of the Tort Immunity Act were not drawn by Illinois legisla-

tors with an intent to deny a remedy when a medical injury resulting from negligence occurs. Then, too, my analysis of the sections of the Tort Immunity Act at issue in this appeal buttresses my view. Since the majority in the instant appeal has a different view, I now write my dissent.

Section 6—105 of the Illinois Tort Immunity Act provides:

> "Neither a local public entity nor a public employee acting within the scope of his employment is liable for injury caused by the failure to make a physical or mental examination, or to make an adequate physical or mental examination of any person for the purpose of determining whether such person has a disease or physical or mental condition that would constitute a hazard to the health or safety of himself or others." 745 ILCS 10/6—105 (West 1996).

In my view, the title of section 6—105 of the Illinois Tort Immunity Act is appropriately titled by *West*. See 745 ILCS 10/6—105 (West 1996); see also Cal. Gov't Code § 855.6 (Deering 1972). Since section 6—105 is derived from section 855.6 of the California Tort Claims Act of 1963 (Cal. Gov't Code § 855.6 (Deering 1972)) (California Act), it is noteworthy that the Law Revision Commission comments to section 855.6 of the California Act state:

> "This section declares an immunity that has been recognized by the New York courts in the absence of a statute. It grants an immunity for failure to perform adequately public health examinations such as public tuberculosis examinations, physical examinations to determine the qualifications of boxers and other athletes, and eye examinations for vehicle operator applicants. *It does not apply to examinations for the purpose of treatment such as are made in doctors' offices and public hospitals. In those situations, the ordinary rules of liability would apply."* (Emphasis added.) 4 Cal. Revision Comm'n Rep. 801 at 865 (1963).

Another comment made by the California Law Revision Commission is that, "the immunity provided by this section relates only to the failure to make any examination or, if an examination is made, to the 'adequacy' of the examination; the section does not provide immunity, for example, where a public employee negligently injures a person while making an examination" Cal. Law Revision Comm'n, Recommendations Relating to Sovereign Immunity, 4 Reports, Rec. & Studies 801 (1963). This comment is also applicable to the Tort Immunity Act. See J. Latturner, *Local Government Tort Immunity and Liability in Illinois*, 55 Ill. B.J. 28, 41 (1966).

In construing section 6—105, an instructive case is *Harvey v. Clyde Park District*, 32 Ill. 2d 60, 203 N.E.2d 573 (1965). In *Harvey*, a suit was instituted on behalf of Wilborn Harvey, a minor, to recover damages for injuries alleged to have been caused by the negligence of the

defendant, Clyde Park District. The defendant moved to dismiss the complaint on the ground that it was immune from liability by reason of section 12.1 of the Park District Code, which provided in pertinent part: "Any park district shall not be liable for any injuries to person or property *** resulting from the negligence of its agents ***." Ill. Rev. Stat. 1963, ch. 105, par. 12.1—1.

The trial court sustained the motion to dismiss. Plaintiff appealed directly to the Illinois Supreme Court, contending that the statute was unconstitutional because it was special legislation in violation of section 22 of article IV of the Constitution of Illinois (Ill. Const. 1870, art. IV, § 22) and also because it violated section 19 of article II of that constitution, which provided: "Every person ought to find a certain remedy in the laws for all injuries and wrongs which he may receive in his person, property, or reputation ***." Ill. Const. 1870, art. II, § 19. In *Harvey*, the Illinois Supreme Court held the 1959 statute, exempting park districts from liability, unconstitutional and reversed and remanded the case.

Notably, in its decision, the Illinois Supreme Court referred to California legislation, stating: "The recent California legislation carves out numerous areas of nonliability, the most important of which also relates to discretionary acts." *Harvey*, 32 Ill. 2d at 67. The reference by the Illinois Supreme Court to California legislation is significant inasmuch as sections 6—105 and 6—106 of the Illinois Tort Immunity Act were adopted a few months after the *Harvey* decision. Also, significantly, "The Tort Immunity Act is derived from, and in many respects identical to, the California Act". See J. Latturner, *Local Governmental Tort Immunity and Liability in Illinois*, 55 Ill. B.J. 28, 31 (1966).

Moreover, this case involves a doctor-patient relationship and the special nature of the doctor-patient relationship gives rise to a duty that is independent of the doctor's position as a public or private employee. See *Madden v. Kuehn*, 56 Ill. App. 3d 997, 372 N.E.2d 1131 (1978); *Watson v. St. Annes Hospital*, 68 Ill. App. 3d 1048, 386 N.E.2d 885 (1979); *Janes v. Albergo*, 254 Ill. App. 3d 951, 964, 626 N.E.2d 1127, 1133 (1973).

While the majority's construction of section 6—105 provides immunity for doctors and nurses in public hospitals who negligently perform examinations for the purpose of treatment, it is undisputed that doctors and nurses who may perform the same negligent acts at a private hospital would be subject to liability. Such a distinction relative to treatment by doctors and nurses in public entities *vis-a-vis* doctors and nurses in private entities has no rational or reasonable basis. However, in my view, a rational basis does exist to provide immunity

to doctors and nurses in public entities providing preventive examinations in order to determine whether persons have diseases that will constitute a hazard to either themselves or others. Such examinations are made in the interest of the public welfare. Also, judicial notice is taken that preventive examinations may be governmentally mandated.

This interpretation is supported by California case law involving section 855.6 of the California Act. See *Smith v. County of Kern*, 20 Cal. App. 4th 1826, 1835, 25 Cal. Rptr. 2d 716, 722-23 (1993). In *Smith*, the court held that since the public employee's actions were taken to facilitate the delivery of medical diagnosis or care, the immunity did not apply and plaintiff could sustain a cause of action based upon those facts. The court in *Smith* relied upon the following comment regarding the intended effect of California's section 855.6:

> " '[I]t seems clear that this immunity does not apply to medical examinations made in a doctor's office or public hospital for the purpose of treatment. In short, it is not a blanket immunity from medical malpractice liability.' " *Smith*, 20 Cal. App. 4th at 1833-34, 25 Cal. Rptr. 2d at 722, quoting Cal. Government Tort Liability Practice (Cont. Ed. Bar, 3d. ed. 1992) § 4.84, at 548.

Relative to section 6—106(a), the majority also holds that defendants are immune from liability. In so holding the majority, in effect, dismisses and disregards sections 6—106(b), (c), and (d). 745 ILCS 10/6—106(b) through (d) (West 1996). As a result, in my view, the majority misdiagnoses section 6—106(a). 745 ILCS 10/6—106(a) (West 1996).

Section 6—106 of the Tort Immunity Act states:

> "(a) Neither a local public entity nor a public employee acting within the scope of his employment is liable for injury resulting from diagnosing or failing to diagnose that a person is afflicted with mental or physical illness or addiction or from failing to prescribe for mental or physical illness or addiction.
>
> (b) Neither a local public entity nor a public employee acting within the scope of his employment is liable for administering with due care the treatment prescribed for mental or physical illness or addiction.
>
> (c) Nothing in this section exonerates a public employee who has undertaken to prescribe for mental or physical illness or addiction from liability for injury proximately caused by his negligence or by his wrongful act in so prescribing or exonerates a local public entity whose employee, while acting in the scope of his employment, so causes such an injury.
>
> (d) Nothing in this section exonerates a public employee from liability for injury proximately caused by his negligent or wrongful

act or omission in administering any treatment prescribed for mental or physical illness or addiction or exonerates a local public entity whose employee, while acting in the scope of his employment, so causes such an injury." 745 ILCS 10/6—106(a) through (d) (West 1996).

As section 6—106(b) plainly states, an immunity is granted only when medical treatment is being "administer[ed] with due care." 745 ILCS 10/6—106(b) (West 1996). Additionally, subsections (c) and (d) each begin with the language "[n]othing in this section exonerates." 745 ILCS 10/6—106(c), (d) (West 1996). The insertion of such language by the legislature is a clear indication that subsections (c) and (d) were meant to further refine and limit the immunity set out in subsection (a). Subsections (c) and (d) each hold local public entities and their employees liable for "negligence" and "negligent or wrongful acts or omissions" once treatment for a specific medical condition has been "undertaken" and is being "administer[ed]." A failure to properly diagnose and treat a medical condition once treatment of that condition has been undertaken is "negligence," as well as a "negligent act or omission," and the immunity set forth in subsection (a) does not apply. Finally, the legislature used the words "undertaken to prescribe" in subsection (c), and "administering any treatment" in subsection (d). 745 ILCS 10/6—106(c), (d) (West 1996). The legislature's use of such language clearly indicates that it intended local public entities and their employees to be held liable for negligently caring for their patients once medical treatment had been undertaken. In such a situation, therefore, the immunity set forth in subsection (a) again does not apply.

In light of the above, it is clear that section 6—106(a) was not meant to grant a blanket immunity for negligent treatment of a specific medical condition. 745 ILCS 10/6—106(a) (West 1996). In the instant case, each of plaintiff's experts was of the opinion that had Cynthia Collins received the treatment she was denied, the likelihood of her recovery would have increased. Here, the admitted evidence with respect to whether local public entities and their employees negligently treated a specific medical condition gives rise to a material question of fact. Since an issue of fact existed, the majority errs in affirming the trial court's judgment granting defendant's motion for summary judgment.

I dissent.