(No. 88286.—)

MICHIGAN AVENUE NATIONAL BANK, As Special
Adm'r of the Estate of Cynthia Collins, Deceased,
Appellant, v. THE COUNTY OF COOK *et al.*, Ap-
pellees.

*Opinion filed June 15, 2000.*

HARRISON, C.J., dissenting.

Jeffrey M. Goldberg and Michael V. Marsh, of Jeffrey M. Goldberg & Associates, Ltd., of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Patrick T. Driscoll, Thomas M. Burnham, Jason B. Garvis and Marcie Thorp, Assistant State's Attorneys, of counsel), for appellees.

Joel H. Greenburg and Mark Szaflarski, of Chicago, for *amicus curiae* Illinois Trial Lawyers Association.

JUSTICE McMORROW delivered the opinion of the court:

At issue in this appeal is whether defendants, a local public entity and its employees, are immune from liability under sections 6—105 and 6—106 of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/1—101 *et seq.* (West 1992)). Plaintiff, Michigan Avenue National Bank, as special administrator of the estate of decedent Cynthia Collins, filed in the circuit court of Cook County a medical malpractice action against Cook County, Cook County Hospital, Drs. Barbara Weiss and Mohammed Ali, and nurses Mary LeBlanc, Lisa Ferrill, and Irma Garcia. Plaintiff alleged that Collins died as a proximate result of defendants' negligence. Defendants filed a motion for summary judgment, contending that because they were immune from liability pursuant to sections 6—105 and 6—106 of the Tort Immunity Act, they were entitled to judgment as a matter of law. While the summary judgment motion was pending, plaintiff voluntarily dismissed nurses Ferrill and Garcia as defendants. The trial court thereafter granted summary judgment as to the remaining defendants. On appeal, plaintiff argued that defendants were not immune from liability under the Tort Immunity Act. A majority of the appellate court affirmed the trial court's judgment. 306 Ill. App. 3d 392. We allowed plaintiff's petition for leave to appeal. 177 Ill. 2d R. 315(a). In addition, we granted the Illinois Trial Lawyers Association leave to submit a brief as *amicus curiae*. 155 Ill. 2d R. 345. We now affirm the judgment of the appellate court.

### BACKGROUND

On September 22, 1986, Cynthia Collins visited the Fantus Family Planning Clinic, operated by Cook County Hospital. Collins, who was 21 years old at that time, underwent a physical examination, during which a nurse

palpated a lump in Collins' left breast. The clinician form completed by the nurse described the lump as a "soft, non-tender, 2 x 3 cm, cystic mass." A "consultation request form" was also completed by the nurse, referring Collins to the hospital's Breast Oncology Clinic for an appointment on October 22, 1986. This form reflects that the nurse requested that the Breast Oncology Clinic "please evaluate" the mass discovered in Collins' left breast, and noted that Collins' "mother died of breast cancer."

On October 22, 1986, Collins kept her appointment at the Breast Oncology Clinic, and was examined by defendant nurse practitioner Mary LeBlanc. A report signed by LeBlanc and initialed by an unidentified doctor noted that Collins' mother had suffered from breast cancer, and described Collins' breast condition as follows: "Bilateral nodularity. No definite masses, nodes. Positive left axillary lymph node—freely moveable. Negative nipple discharge." The report from this visit indicates that Collins was diagnosed with fibrocystic breast disease, and that Collins was advised to return to the Breast Oncology Clinic three months later, in January 1987. This report further reveals that Collins was "instructed about self-breast exam monthly" and advised to "keep clinic appointment."

In December 1986, Collins made two visits to the emergency room of Cook County Hospital, and, on both occasions, was treated by Dr. Albion, who was not named as a defendant in the instant action. On December 19, 1986, Collins sought treatment because she had missed her menstrual period and was suffering from abdominal pain. Collins also indicated on this occasion that she had experienced soreness in her breasts for one months' duration. At this time, no treatment was administered for Collins' breast pain. On December 29, 1986, Collins sought treatment for abdominal cramps and vaginal discharge.

On January 22, 1987, Collins again returned to the emergency room of Cook County Hospital. The emergency department record indicates that Collins had complained of vaginal discharge, and, after examination, it was discovered that she was suffering from a threatened spontaneous abortion. The emergency department record also states that Collins had been previously diagnosed with fibrocystic breast disease. During this hospital visit, Collins was also seen by Dr. Barbara Weiss, an obstetrician/gynecologist who is a named defendant in this action. In a record entitled "Initial Pregnancy Profile," Dr. Weiss indicated that during Collins' physical examination, she discovered a "cyst" in Collins' inner, mid-right breast. At the conclusion of Collins' hospital visit, the emergency room record reflects that Collins was advised to have bed rest and drink fluids. No treatment was rendered with respect to Collins' breasts.

On February 10, 1987, Collins returned to Cook County Hospital's Fantus Clinic, where she was examined by defendant Dr. Mohammed Ali. In a form entitled "Progress Notes," Dr. Ali indicates that Collins had a "D & C" for an incomplete spontaneous abortion on January 26, 1987, and that, since that time, Collins had experienced vaginal discharge. Dr. Ali's progress notes also indicate that Collins was suffering from abdominal cramps for three weeks, and that Collins complained of "sharp" breast pain "off and on" for a three-week period. The record reveals that Dr. Ali performed a pelvic examination of Collins, wrote that Collins' breasts were "within normal limits," and recommended that Collins return to the hospital's Family Planning Clinic in three months and to the Gynecological Clinic in one year.

In August 1987, Collins became pregnant and obtained prenatal care at MacNeal Hospital/Rush Presbyterian through her employer's health care coverage. During a prenatal exam, Collins informed her physician of

her family history of breast cancer, of the masses discovered in her breasts during her visits to Cook County Hospital, and of her previous complaints of breast pain. The physician instructed Collins to undergo a mammogram after the birth of her child. Collins delivered her baby in May 1988, and in July 1988, a biopsy revealed that Collins' left breast was cancerous and that the cancer had spread to her neck and arm area. A mastectomy was performed, and Collins thereafter underwent radiation and chemotherapy treatments. Collins died of breast cancer in November 1989.

Plaintiff filed a two-count complaint seeking recovery for damages resulting from the alleged medical malpractice of defendants. Count I, which was brought pursuant to the Wrongful Death Act (Ill. Rev. Stat. 1985, ch. 70, par. 1 *et seq.*), and count II, which was brought pursuant to the Survival Act (Ill. Rev. Stat. 1985, ch. 110½, par. 27—6), revolve around Collins' visits to Cook County health facilities from September 22, 1986, to February 10, 1987, and allege that defendants were negligent in five respects: (1) defendants "[f]ailed to order a mammogram when a lump was palpated in decedent's left breast"; (2) defendants "[f]ailed to properly and adequately perform examinations and tests on decedent"; (3) defendants "[f]ailed to perform a biopsy when a lump was palpated in decedent's left breast"; (4) defendants "[f]ailed to diagnose decedent's condition of breast cancer"; and (5) defendants "[f]ailed to administer proper, appropriate and necessary medical and nursing care and attention to the decedent." Plaintiff's complaint further alleged that "as a proximate cause of one or more of the foregoing negligent acts or omissions, [Collins] died on November 22, 1989."

Attached to plaintiff's complaint was an affidavit prepared in accordance with section 2—622(a)(1) of the Code of Civil Procedure (735 ILCS 5/2—622(a)(1) (West 1992)),

wherein a physician opined that, after a review of Collins' medical records, there existed a reasonable and meritorious cause for plaintiff to file this action. Specifically, the physician stated that it was his opinion that defendants "negligently failed to perform a mammogram and/or immediate biopsy of the lump in [Collins'] left breast, given her family history of breast cancer and her presentation to these Cook County Hospital physicians and health care providers with a lump in her left breast."

In their answer to plaintiff's complaint, defendants admitted that Collins had been under their care. However, defendants denied any wrongdoing with respect to Collins' care and treatment, and affirmatively alleged that they were immune from liability pursuant to sections 6—105 and 6—106 of the Tort Immunity Act. Specifically, defendants asserted that, under section 6—105, they were immunized from the "failure to make a physical *** examination, or to make an adequate physical *** examination" (745 ILCS 10/6—105 (West 1992)), and that section 6—106 provided immunity from liability "resulting from diagnosing or failing to diagnose that a person is afflicted with *** physical illness" (745 ILCS 10/6—106(a) (West 1992)).

After the parties engaged in discovery, defendants moved for summary judgment. In their motion, defendants disputed neither the facts as alleged by plaintiff in its complaint nor the opinions of plaintiff's two medical experts. Instead, defendants asserted that, even assuming the truth of those facts and opinions, they were entitled to judgment as a matter of law because they were statutorily immunized from liability pursuant to sections 6—105 and 6—106 of the Tort Immunity Act.

In support of their summary judgment motion, defendants attached the transcripts of the deposition testimony of plaintiff's two medical expert witnesses. In his deposition, Dr. Joseph E. Russ opined that the

unidentified physician involved in Collins' October 1986 visit to the Breast Oncology Clinic deviated from the standard of care in two respects: by failing to perform any testing to diagnose breast cancer, such as ordering a biopsy or a mammogram, and by failing to instruct Collins to return to the clinic earlier than in three months' time. Dr. Russ also opined that nurse LeBlanc deviated from the standard of care if she failed to discuss the findings of her examination with a breast surgeon. Plaintiff's second expert, Dr. Larry S. Milner, opined that the standard of care was breached by nurse LeBlanc if LeBlanc had failed to consult with a physician during Collins' October 1986 visit to the Breast Oncology Clinic. According to Dr. Milner, LeBlanc also deviated from the standard of care by failing to request that a mammogram, biopsy or ultrasound be performed on Collins, and by failing to instruct Collins to return to the Breast Oncology Clinic in four to six weeks for further evaluation. Dr. Milner further opined that the standard of care was breached by Dr. Weiss when she discovered a cyst in Collins' breast and failed to arrange for a visit to the surgical clinic or to explain to Collins that her condition required the scheduling of such a visit. Dr. Milner also testified that Dr. Ali deviated from the standard of care, based upon Milner's belief that Ali failed to perform a breast examination on Collins during her February 10, 1987, visit to the Fantus Clinic. Finally, in their depositions, both Drs. Russ and Milner opined that the failure to diagnose Collins' breast cancer was the proximate cause of her death. After considering the evidence, the trial court granted summary judgment to defendants, and plaintiff appealed.

In affirming the judgment of the circuit court, a majority of the appellate court rejected plaintiff's argument that the immunity conferred in section 6—105 of the Tort Immunity Act is limited to preventive public health

screenings. Rather, the majority determined that section 6—105 of the Act "is broad in scope and immunizes local public entities and public employees who fail to make or who make inadequate physical or mental examinations for purposes of determining whether a person suffers from a disease or physical or mental condition." 306 Ill. App. 3d at 401.

The appellate court majority also found that, because plaintiff's cause was premised upon the theory that Collins died due to defendants' failure to conduct further diagnostic testing and evaluation to determine whether she suffered from breast cancer in addition to fibrocystic breast disease, defendants' conduct was immunized under subsection (a) of section 6—106, which provides that defendants are not liable for injuries resulting from failing to diagnose a physical illness. The majority rejected plaintiff's argument that the negligent treatment exception contained in subsection (d) of section 6—106 negated the immunity conferred upon defendants pursuant to section 6—106(a). The majority found that, based upon the evidence presented, no medical treatment had been prescribed or undertaken by defendants in connection with Collins' fibrocystic breast condition. 306 Ill. App. 3d at 403.

In dissent, Justice Cousins wrote that the majority's interpretation of sections 6—105 and 6—106 of the Tort Immunity Act incorrectly disregarded the Illinois Constitutional provision that states that "[e]very person shall find a certain remedy in the laws for all injuries and wrongs which he receives to his person." Ill. Const. 1970, art. I, § 12. Specifically, the dissenting justice found the majority's interpretation of section 6—105 to be unduly broad, and instead agreed with plaintiff's contention that section 6—105 confers immunity to public entities and their employees only in the limited instance where preventive examinations are provided to the public at

large in order to determine whether persons have diseases that will constitute a hazard to either themselves or others. 306 Ill. App. 3d at 408-09 (Cousins, J., dissenting).

The dissenting justice also disagreed with the majority's holding that defendants were immunized pursuant to section 6—106(a). Instead, the justice concluded that a genuine issue of material fact existed with respect to whether defendants were liable, pursuant to subsections (b), (c), and/or (d) of section 6—106, for negligently treating Collins' breast condition. 306 Ill. App. 3d at 410 (Cousins, J., dissenting). Therefore, in the view of the dissenting justice, summary judgment was inappropriately granted to defendants.

## ANALYSIS

The issue presented in this case is whether sections 6—105 and 6—106 of the Tort Immunity Act immunize defendants, a public hospital and its employee physicians and nurses, from liability for the medical malpractice alleged in this action. Local governmental entities are liable in tort on the same basis as private tortfeasors unless a valid statute dealing with tort immunity imposes limitations upon that liability. *Harinek v. 161 North Clark Street Ltd. Partnership*, 181 Ill. 2d 335, 345 (1998). The immunities afforded to units of local government under the Tort Immunity Act operate as an affirmative defense which, if properly raised and proven by the public entity, precludes a plaintiff's right to recover damages. *Zimmerman v. Village of Skokie*, 183 Ill. 2d 30, 43-44 (1998). The resolution of the dispute in the instant cause depends on statutory construction. Because the construction of a statute is a question of law, we review the merits of this cause *de novo. Paris v. Feder*, 179 Ill. 2d 173, 177-78 (1997).

It is well established that the primary objective of this court when construing the meaning of a statute is to

ascertain and give effect to the legislature's intent. *Boaden v. Department of Law Enforcement*, 171 Ill. 2d 230, 237 (1996). In determining the intent of the legislature, we begin with the language of the statute, the most reliable indicator of the legislature's objectives in enacting a particular law. *Nottage v. Jeka*, 172 Ill. 2d 386, 392 (1996). The statutory language must be given its plain and ordinary meaning, and, where the language is clear and unambiguous, we must apply the statute without resort to further aids of statutory construction. *Davis v. Toshiba Machine Co., America*, 186 Ill. 2d 181, 184-85 (1999). One of the fundamental principles of statutory construction is to view all provisions of an enactment as a whole. Words and phrases should not be construed in isolation, but must be interpreted in light of other relevant provisions of the statute. *Antunes v. Sookhakitch*, 146 Ill. 2d 477, 484 (1992). In construing a statute, courts presume that the General Assembly, in the enactment of legislation, did not intend absurdity, inconvenience, or injustice. *Harris v. Manor Healthcare Corp.*, 111 Ill. 2d 350, 362-63 (1986). We consider plaintiff's arguments *seriatim*.

Section 6—105 of the Tort Immunity Act provides:

"Neither a local public entity nor a public employee acting within the scope of his employment is liable for injury caused by the failure to make a physical or mental examination, or to make an adequate physical or mental examination of any person for the purpose of determining whether such person has a disease or physical or mental condition that would constitute a hazard to the health or safety of himself or others." 745 ILCS 10/6—105 (West 1992).

The language of section 6—105 is interpreted by plaintiff as limiting the scope of immunity to only those instances where a local public entity and its public employees conduct "preventive-type" health screenings for the public at large. Based upon this interpretation, plaintiff asserts that, under the facts of this case, the only occasion

upon which section 6—105 immunity could possibly be invoked by defendants was for the examination conducted of Collins on September 22, 1986, which plaintiff has conceded could be characterized as a "preventive-type" screening. However, because plaintiff does not challenge the conduct of defendants on September 22, plaintiff contends that section 6—105 has no application to the medical malpractice claims raised in this lawsuit, which deal with defendants' conduct subsequent to Collins' September 1986 clinic visit.

We reject plaintiff's strained interpretation of section 6—105. By its plain terms, section 6—105 provides immunity from liability to a local public entity and its employees who have failed to make a physical or mental examination, or who have failed to make an adequate physical or mental examination. We discern no language within this statutory provision which indicates that the General Assembly intended to confine the scope of immunity to preventive health examinations of the public at large.

In support of its position that the immunity afforded to public entities and their public employees pursuant to section 6—105 is limited to "preventive" health examinations performed for the public at large, plaintiff presents two arguments which were correctly rejected by the appellate court. First, plaintiff inappropriately relies upon the caption of section 6—105 as it appears in West Group's edition of the Illinois Compiled Statutes, which reads: "Preventive physical or mental examination of the person." Although plaintiff acknowledges that the appellate court rejected its argument that this caption suggests that the scope of the immunity conferred by section 6—105 is limited, plaintiff again references this caption as supporting its narrow interpretation of this statutory provision.

When the legislature enacts an official title or head-

ing to accompany a statutory provision, that title or heading is considered only as a "short-hand reference to the general subject matter involved" in that statutory section, and "cannot limit the plain meaning of the text." *Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528-29, 91 L. Ed. 1646, 1652, 67 S. Ct. 1387, 1392 (1947). A review of the official version of the Tort Immunity Act, as enacted in 1965, reveals that none of the statutory sections, including section 6—105, contained official headings or titles. See 1965 Ill. Laws 2982-96. In addition, no amendment has been made to section 6—105 by the General Assembly to include an official heading or title. An unofficial, publisher-generated caption is irrelevant in interpreting the scope of a statutory provision. *Greater Peoria Sanitary & Sewage Disposal District v. Baise*, 234 Ill. App. 3d 622, 626 (1992).

Further, we note that, even *if* the caption relied upon by plaintiff were an *official* heading or title enacted by the General Assembly to accompany section 6—105, plaintiff's argument would nevertheless lack merit. Official headings or titles "are of use only when they shed light on some ambiguous word or phrase" within the text of the statute, and "they cannot undo or limit that which the text makes plain." *Brotherhood of R.R. Trainmen*, 331 U.S. at 528-29, 91 L. Ed. at 1652, 67 S. Ct. at 1392; see also *DeWitt v. McHenry County*, 294 Ill. App. 3d 712, 716 (1998); *Baise*, 234 Ill. App. 3d 622; *People v. Lamb*, 224 Ill. App. 3d 950, 953 (1992). We find no ambiguity in the language of section 6—105 in regard to the scope of immunity. Therefore, it would be inappropriate to consider any official titles or headings in construing this statutory provision.

In support of its position that the immunity conferred upon defendants by section 6—105 is limited in scope, plaintiff relies upon a law review article in which it is suggested that section 6—105 of the Tort Immunity Act

is derived from section 855.6 of the California Government Code. See J. Latturner, *Local Governmental Tort Immunity and Liability in Illinois*, 55 Ill. B.J. 28 (1966).[1] As argued before the appellate court, plaintiff contends that because the immunity conferred by California's section 855.6 is limited to preventive public health screenings, the immunity provided in section 6—105 of our Tort Reform Act should be similarly limited.

To this end, plaintiff quotes the California Law Revision Commission's commentary concerning the enactment of section 855.6:

"[Section 855.6 of the California Government Code] grants an immunity for failure to perform adequately public health examinations such as public tuberculosis examinations, physical examinations to determine the qualifications of boxers and other athletes, and eye examinations for vehicle operator applicants. It does not apply to examinations for the purposes of treatment such as are made in doctors' offices and public hospitals. In those situations, the ordinary rules of liability would apply." Cal. Gov't Code § 855.6, Law Revision Commission Comments, at 352 (Deering 1982).

Because of the clear differences between the California statute and section 6—105, we reject plaintiff's attempted analogy.

Section 855.6 of the California Government Code provides:

"*Except for an examination or diagnosis for the purpose of treatment,* neither a public entity nor a public employee acting within the scope of his employment is liable for injury caused by the failure to make a physical or mental examination, or to make an adequate physical or mental examination, of any person for the purpose of determining whether such person has a disease or physical or mental condition that would constitute a hazard to the health or safety of himself or others." (Emphasis added.) Cal. Gov't Code § 855.6 (Deering 1982).

---

[1]We express no opinion on the derivation of section 6—105.

Although section 6—105 mirrors most of section 855.6 of the California Government Code, we find it significant that section 6—105 lacks the limiting phrase "[e]xcept for an examination or diagnosis for the purpose of treatment," which, at the outset of the California provision, sets forth a definite exception from the immunity conferred by the remainder of that statutory section. Indeed, the commentary prepared by the California Law Revision Commission underscores the clear differences between these two statutes by emphasizing the pivotal nature of the exclusionary language which appears in the opening sentence of the California provision and which is absent from section 6—105. Plaintiff's argument is further belied by the law review article upon which plaintiff relies, wherein the author suggests that, based upon the dissimilarities between the California and Illinois statutes, the immunity conferred by section 6—105 applies "to all examinations, wherever made and for any purpose." 55 Ill. B.J. at 41. In sum, unlike section 6—105, section 855.6 of the California Government Code explicitly provides that local public entities and their public employees are liable for failing to make, or inadequately making, an examination in the course of treatment. We therefore conclude that any attempted analogy between these two statutory provisions is inapposite.

We adhere to the well-settled rule that "[w]here the language of a statute is clear and unambiguous, a court must give it effect as written, without 'reading into it exceptions, limitations or conditions that the legislature did not express.' " *Garza v. Navistar International Transportation Corp.*, 172 Ill. 2d 373, 378 (1996), quoting *Solich v. George & Anna Portes Cancer Prevention Center of Chicago, Inc.*, 158 Ill. 2d 76, 83 (1994). We therefore reject plaintiff's plea to engraft limitations and exceptions onto section 6—105 which conflict with the express intent of the legislature as revealed by the statute's plain language.

In addition to its arguments concerning section 6—105, plaintiff contends that the lower courts erred in holding that defendants were vested with immunity from liability pursuant to section 6—106(a) of the Tort Immunity Act. Section 6—106 of the Act provides:

"(a) Neither a local public entity nor a public employee acting within the scope of his employment is liable for injury resulting from diagnosing or failing to diagnose that a person is afflicted with mental or physical illness or addiction or from failing to prescribe for mental or physical illness or addiction.

(b) Neither a local public entity nor a public employee acting within the scope of his employment is liable for administering with due care the treatment prescribed for mental or physical illness or addiction.

(c) Nothing in this section exonerates a public employee who has undertaken to prescribe for mental or physical illness or addiction from liability for injury proximately caused by his negligence or by his wrongful act in so prescribing or exonerates a local public entity whose employee, while acting in the scope of his employment, so causes such an injury.

(d) Nothing in this section exonerates a public employee from liability for injury proximately caused by his negligent or wrongful act or omission in administering any treatment prescribed for mental or physical illness or addiction or exonerates a local public entity whose employee, while acting in the scope of his employment, so causes such an injury." 745 ILCS 10/6—106 (West 1992).

Characterizing its lawsuit against defendants as grounded in their "repeated failure to administer proper treatment to Cynthia Collins after they determined that she suffered from a specific medical condition," plaintiff argues that, pursuant to subsections (b), (c) and (d) of section 6—106, defendants are liable under the facts presented in this cause. Defendants counter that because plaintiff's suit is based upon defendants' failure to diagnose Collins' breast cancer, and because defendants rendered no treatment for Collins' breast condition, the

lower courts properly found that they were immunized from liability pursuant to section 6—106(a). Our resolution of this matter requires us to construe the language of section 6—106.

The plain language of subsection (a) of section 6—106 delineates three areas of specific conduct for which a local public entity and its public employees are immunized. Section 6—106(a) grants defendants immunity from liability for injury resulting from: (1) a diagnosis that a person is afflicted with a mental or physical illness or addiction; (2) failing to diagnose that a person is afflicted with a mental or physical illness or addiction; and/or (3) failing to prescribe for a mental or physical illness or addiction. 745 ILCS 10/6—106(a) (West 1992).

We find no ambiguity in the word "diagnosis" as employed in section 6—106(a). Therefore, this word must be accorded its plain and ordinary meaning. *Hernon v. E.W. Corrigan Construction Co.*, 149 Ill. 2d 190, 194-95 (1992). Webster's dictionary defines "diagnosis" as the "art or act of identifying a disease from its signs and symptoms," and as an "investigation or analysis of the cause or nature of a condition, situation, or problem." Webster's Third New International Dictionary 622 (1993). The Sloan-Dorland Annotated Medical-Legal Dictionary defines "diagnosis" as "the art of distinguishing one disease from another" and as "the determination of the nature of a case of disease." Sloan-Dorland Annotated Medical-Legal Dictionary 199 (1987). See also Attorney's Dictionary of Medicine D-102 (1999) ("diagnosis" is defined as "[t]he determination of what kind of disease a patient is suffering from, especially the art of distinguishing between several possibilities"); Black's Law Dictionary 464 (7th ed. 1999) (defining "diagnosis" as "[t]he determination of a medical condition (such as disease) by physical examination or by study of its symptoms"); Stedman's Medical Dictionary 428 (25th ed.

1990) (denoting "diagnosis" as "[t]he determination of the nature of a disease").

In its brief to this court, plaintiff argues, and defendants do not contest, that section 6—106 "was not meant to grant blanket immunity for negligent treatment of a specific medical condition." We agree. Although subsection (a) of section 6—106 grants immunity for diagnosing, or failing to diagnose, that a person is afflicted with a physical illness, the remaining subsections of section 6—106 contain limitations on immunity where it is alleged that a local public entity and its public employees have caused a person to suffer injury due to the negligent prescription of treatment and/or the negligent administration of treatment. Specifically, subsection (b) of section 6—106 provides that a local public entity and its public employees are vested with immunity where they administer treatment prescribed for mental or physical illness or addiction, so long as such treatment is administered with "due care." 745 ILCS 10/6—106(b) (West 1992). Subsection (c) of section 6—106 states that defendants are not immunized where, having undertaken to prescribe for mental or physical illness or addiction, they have proximately caused an injury to a patient due to negligence or wrongful acts in so prescribing. 745 ILCS 10/6—106(c) (West 1992). Finally, subsection (d) of section 6—106 provides that defendants are liable for injury proximately caused by their negligent acts or omissions in the administration of any treatment prescribed for mental or physical illness or addiction. 745 ILCS 10/6—106(d) (West 1992).

We conclude that the word "treatment," as used within section 6—106, is not ambiguous. Therefore, this word must be accorded its plain and ordinary meaning. *Hernon*, 149 Ill. 2d at 194-95. "[T]reatment" is defined in Webster's Dictionary as "the action or manner of treating a patient medically or surgically." Webster's

Third New International Dictionary 2435 (1993). The Medical Dictionary for Lawyers defines "treatment" as "[t]he care of a sick person, and the remedies or means employed to combat the disease affecting him." B. Maloy, Medical Dictionary for Lawyers 681 (3d ed. 1960). "Treatment" is denoted in Sloan-Dorland's as "[t]he management and care of a patient for the purpose of combating disease or disorder." Sloan-Dorland Annotated Medical-Legal Dictionary 746 (1987). See also Stedman's Medical Dictionary 1626 (25th ed. 1990) (defining "treatment" as "[t]he medical or surgical management of a patient").

Plaintiff maintains that the allegations in its complaint, as well as the evidence presented in support of these allegations, establish that its suit revolves around defendants' repeated failure to properly treat Collins' breast condition. Plaintiff concludes that, because this action establishes a "treatment fact scenario" within the meaning of subsections (b), (c), and (d) of section 6—106, defendants are subject to liability, and summary judgment was improperly granted. We disagree. Because the gravamen of plaintiff's action against defendants is that defendants' failure either to perform examinations or to adequately perform examinations led to defendant's failure to diagnose Collins' breast cancer, which, in turn, proximately caused her death, the immunity provided to local public entities and their public employees in section 6—105 and subsection (a) of section 6—106 applies.

A review of the particular allegations made in plaintiff's complaint belies plaintiff's contention that its action against defendants is based upon negligent provision of medical treatment to Collins for her breast condition. To the contrary, four of the five allegations in the complaint specifically relate to examinations and diagnostic actions. Plaintiff alleges that defendants "failed to order a mammogram when a lump was palpated in [Col-

lins'] left breast''; "failed to properly and adequately perform examinations and tests on [Collins]''; "failed to perform a biopsy when a lump was palpated in [Collins'] left breast''; and "failed to diagnose [Collins'] condition of breast cancer." Plaintiff also concludes in the complaint that "as a proximate cause of one or more of the foregoing negligent acts or omissions, [Collins] died." Clearly, the import of the above allegations is that Collins' death was caused by defendants' failure to perform examinations, defendants' failure to adequately perform examinations, and defendants' failure to diagnose Collins' breast cancer. Although the fifth and final allegation in plaintiff's complaint vaguely states that defendants were negligent in that they "[f]ailed to administer proper, appropriate and necessary medical care and attention to [Collins]," we conclude that the pleadings and the evidence presented during the summary judgment proceedings contradict plaintiff's assertion that its action is premised upon defendants' negligent treatment of Collins.

For example, in its written response to defendant's motion for summary judgment, plaintiff stated that "the facts of this case represent a faulty diagnosis of fibrocystic breast disease which resulted from defendants [sic] failure to preform [sic] the appropriate medical diagnostic tests necessary to determine the actual nature of plaintiff's breast disease, i.e. early stage breast cancer." This statement clearly indicates that, in the circuit court, plaintiff had presented this case as an action for a failure to perform testing, as a failure to adequately perform testing, and as a failure to diagnose Collins' cancer.

Plaintiff further contended in its response to defendants' summary judgment motion that "the misdiagnosis of fibrocystic breast disease arrived at through the negligence of the defendants" constituted the proximate cause of Collins' death. Before this court, plaintiff

similarly contends that defendants negligently "misdiagnosed" Collins as suffering from fibrocystic breast disease, and asserts that this misdiagnosis prevented the discovery of Collins' breast cancer, thereby leading to her death. "Misdiagnosis" is defined as a "wrong or mistaken diagnosis." Stedman's Medical Dictionary 973 (25th ed. 1990). Because subsection (a) of section 6—106 immunizes defendants "from diagnosing or failing to diagnose" that a person has a physical illness, plaintiff's attempts to characterize its lawsuit as a case of "misdiagnosis" does not remove its action from the ambit of subsection (a) of section 6—106.

In addition, plaintiff's argument that this cause constitutes an action for negligent treatment is not supported by the deposition testimony of its own experts. Contrary to plaintiff's assertions, both Dr. Russ and Dr. Milner testified that plaintiff indeed suffered from fibrocystic breast disease when she visited Cook County Hospital clinics on September 22, 1986, and October 22, 1986. Dr. Russ defined fibrocystic breast disease as "a condition" in which the patient has "dense nodular breast tissue," and stated that, in laymen's term, this "usually means that a woman has lumpy breasts." Dr. Milner testified that although fibrocystic breast disease is "a quite common occurrence in all women," and that Collins' presentation in 1986 was consistent with this affliction, he opined that it could also have been consistent with cancer. Based upon his review of Collins' medical records, Dr. Milner believed that there was cancer "mixed up" with the bilateral nodulation discovered in Collins' breasts in 1986.

Both Dr. Russ and Dr. Milner concluded that during Collins' October 22, 1986, clinic visit, violations of the standard of care occurred. These violations, however, relate to defendants' failure to examine Collins and diagnose her breast cancer. Specifically, both experts con-

cluded that nurse LeBlanc deviated from the standard of care if she had failed to consult with a breast surgeon or physician concerning the findings of her examination. If LeBlanc had made such a consultation, both Drs. Russ and Milner concluded, it was a violation of the standard of care by the unidentified physician to instruct Collins to return to the clinic after the passage of three months because, in the words of Dr. Russ, "additional evaluation should have been performed" in light of Collins' symptoms and family history of breast cancer. Dr. Russ and Dr. Milner further opined that the unidentified physician also deviated from the standard of care by not performing appropriate testing. Dr. Russ testified that it was the physician's "duty" to "support his diagnosis" with a mammogram, breast ultrasound, or breast biopsy, and, had the physician done so, Dr. Russ opined that "he would have diagnosed breast cancer." Dr. Milner echoed this opinion, stating that failure to perform testing to "reassess the problem" is "below the standard of care in evaluating a woman with a new breast lump," and that mammograms are a common diagnostic tool used on a patient with fibrocystic breast disease to discover any potential malignancies.

Dr. Russ stated that although the physician was "faced with indications to do additional testing," he did "nothing that he should have done to diagnose" cancer, and that it was incumbent upon defendants to "pursue their findings to support the fact that [Collins], yes, indeed, had fibrocystic disease or did she have breast cancer." Dr. Russ concluded that the failure to conduct appropriate testing in order to diagnose the breast cancer in October 1986 was the proximate cause of Collins' death.

Our review of the testimony of plaintiff's own experts leads to the conclusion that, contrary to plaintiff's assertions that the record establishes that its action against

defendants is grounded in negligent prescription and administration of treatment within the meaning of subsections (c) and (d) of section 6—106, the essence of plaintiff's suit is that defendants failed to properly examine Collins and diagnose her breast cancer. The record is devoid of any testimony from plaintiff's experts that fibrocystic breast disease is. treatable, that any treatment of Collins' fibrocystic breast disease had been performed during the October 1986 visit, or that there was negligence in the course of any treatment. The criticisms lodged against defendants by plaintiff's experts in respect to Collins' October 22, 1986, clinic visit focused upon the failure to perform certain examinations, such as a mammogram, ultrasound or biopsy. This failure, in turn, led to defendants' failure to diagnose Collins' breast cancer, which, the experts surmised, had coexisted with Collins' fibrocystic condition. Section 6—105 immunity applies to defendants' alleged failure to conduct physical examinations in order to evaluate whether Collins suffered from breast cancer in addition to fibrocystic condition. In addition, because defendants rendered no medical treatment to Collins in relation to her breast condition on October 22, 1986, defendants' failure to diagnose breast cancer is conduct to which section 6—106(a) immunity applies.

In respect to the conduct of Dr. Weiss, Dr. Russ testified that he had formulated no opinion concerning her actions on January 22, 1987. In Dr. Milner's opinion, when Dr. Weiss discovered a cyst in Collins' breast during her examination, Dr. Weiss should have scheduled Collins to visit the hospital's breast clinic for a follow-up assessment, or, at the least, she should have explained to Collins that there was a problem with her breast that required further evaluation. The record reveals that Dr. Weiss, an obstetrician/gynecologist, rendered emergency treatment to Collins for a threatened spontaneous abor-

tion, and that Weiss prescribed for Collins bed rest and the drinking of fluids. Dr. Weiss did not prescribe or administer any treatment in connection with plaintiff's breast condition. These facts, coupled with Dr. Milner's testimony that Dr. Weiss violated the standard of care by failing to refer Collins for diagnostic testing, leads us to the conclusion that section 6—105 and 6—106(a) immunity applies to the doctor's alleged misconduct.

Finally, in respect to the actions of Dr. Ali on February 10, 1987, Dr. Russ had no opinion concerning Dr. Ali's conduct. Dr. Milner testified that if Dr. Ali had not performed a breast examination of Collins in reaction to Collins' complaint of sharp breast pain, then Dr. Ali's failure would have violated the standard of care. However, Dr. Milner acknowledged during his testimony that Dr. Ali's progress notes indicated that Collins' breasts were "within normal limits," and that during his deposition Dr. Ali testified that he was fairly certain that a breast examination had been performed. There is no indication in the record that Dr. Ali rendered treatment to Collins in February 1987. This fact, coupled with Dr. Milner's testimony that Dr. Ali violated the standard of care by failing to examine, or performing an inadequate examination of, Collins' breasts, leads us to conclude that section 6—105 immunity applies to Dr. Ali's alleged misconduct.

Summary judgment is appropriate where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2—1005(c) (West 1992); *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 517-18 (1993). Summary judgment should not be granted unless the right of the moving party is clear and free from doubt. *Purtill v. Hess*, 111 Ill. 2d 229, 240 (1986). However, although the non-

moving party in a summary judgment motion is not required to prove his or her case, the nonmovant must nonetheless present a factual basis which would arguably entitle that party to a judgment. *John Alden Life Insurance Co. v. Propp*, 255 Ill. App. 3d 1005, 1008 (1994). In sum, our review of plaintiff's complaint and supporting evidence, made in light of the plain language of sections 6—105 and 6—106, establishes that defendants are immunized and, therefore, summary judgment was appropriately granted.

Plaintiff additionally argues that application of section 6—105 and 6—106 of the Tort Immunity Act as a defense to the allegations in its lawsuit "is unconstitutional in that it deprives Cynthia Collins a remedy for an injury and wrong inflicted upon her person." In support of this contention, plaintiff cites to article I, section 12, of the 1870 Illinois Constitution. We note that no such section exists within the Illinois Constitution of 1870. From the context of plaintiff's brief, we conclude that plaintiff intended to cite to article I, section 12, of the 1970 Illinois Constitution, which provides, in pertinent part, that "[e]very person shall find a certain remedy in the laws for all injuries and wrongs which he receives to his person, privacy, property or reputation." Ill. Const. 1970, art. I, § 12. Defendant responds that plaintiff has waived this argument, as this contention was first raised not by plaintiff in the courts below, but by Justice Cousins in his dissent. See 306 Ill. App. 3d at 406-07 (Cousins, J., dissenting). It is well settled that the waiver rule is a limitation on the parties and not the jurisdiction of this court, which has the responsibility of achieving a just result and maintaining a sound and uniform body of precedent. See *Chicago Patrolmen's Ass'n v. Department of Revenue*, 171 Ill. 2d 263, 278 (1996); *Wagner v. City of Chicago*, 166 Ill. 2d 144, 148 (1995); *Jackson Jordan, Inc. v. Leydig, Voit & Mayer*, 158 Ill. 2d 240, 251 (1994);

*Hux v. Raben*, 38 Ill. 2d 223, 225 (1967). Because this issue is one of law, and because it has been fully briefed and argued by the parties, we choose to address plaintiff's contention. See *Committee for Educational Rights v. Edgar*, 174 Ill. 2d 1, 11 (1996); *People ex rel. Daley v. Datacom Systems Corp.*, 146 Ill. 2d 1, 27 (1991); *Hux*, 38 Ill. 2d at 225.

We conclude that plaintiff's argument lacks merit. This court has previously rejected a similar argument in *Sullivan v. Midlothian Park District*, 51 Ill. 2d 274 (1972). There, the plaintiff appealed the trial court's dismissal of its complaint on the basis of the Tort Immunity Act, arguing that the immunity afforded municipal agencies under the Act violated section 19 of article II of the Illinois Constitution of 1870, the predecessor provision to article I, section 12, of the 1970 Constitution. In rejecting plaintiff's assertion that the Tort Immunity Act unconstitutionally denied her any remedy for injuries suffered as a proximate result of the negligence of the local governmental entity, this court determined that the cited constitutional provisions "are an expression of a philosophy and not a mandate that a 'certain remedy' be provided in any specific form or that the nature of the proof necessary to the award of a judgment or decree continue without modification." *Sullivan*, 51 Ill. 2d at 277; see also *McAlister v. Schick*, 147 Ill. 2d 84, 98 (1992); *Mega v. Holy Cross Hospital*, 111 Ill. 2d 416, 424 (1986). Moreover, the legislature has the inherent authority to repeal or change the common law and may do away with all or part of it. *People v. Gersch*, 135 Ill. 2d 384, 395 (1990). In enacting the Tort Immunity Act, the legislature specifically stated that its purpose was to "protect local public entities and public employees from liability arising from the operation of government." 745 ILCS 10/1—101.1 (West 1992). Therefore, passage of the Tort Immunity Act constituted an exercise by the General As-

sembly of its broad power to determine whether a statute that restricts or alters an existing remedy is reasonably necessary to promote the general welfare. See *Bilyk v. Chicago Transit Authority*, 125 Ill. 2d 230, 245 (1988). Based upon the above principles, we conclude that plaintiff's argument fails.

Plaintiff also maintains that "the appellate court erred in failing to recognize that the special nature of the doctor-patient relationship gives rise to a duty which is independent of defendants' position as employees of a public entity." Taking this argument to its conclusion, plaintiff contends that local public entities and their employee physicians and nurses are subject to personal tort liability, despite the immunities afforded under the Tort Immunity Act. In support of this proposition, plaintiff cites to three decisions in which the appellate court held that diagnosis and treatment of patients are not governmental in character so as to qualify for public officials' immunity. *Janes v. Albergo*, 254 Ill. App. 3d 951 (1993); *Watson v. St. Annes Hospital*, 68 Ill. App. 3d 1048 (1979); *Madden v. Kuehn*, 56 Ill. App. 3d 997 (1978). We find plaintiff's reliance upon the cited decisions to be factually inapposite to the matter at bar.

In *Janes*, *Watson*, and *Madden*, plaintiffs brought suit against health care professionals who were employed by the State of Illinois. The defendant doctors and nurses sought dismissal of the actions on the grounds of public official immunity, a common law doctrine which serves to protect state officials from being inhibited from acting in the public's best interest because of fears of personal liability. See *Currie v. Lao*, 148 Ill. 2d 151, 166 (1992). However, public official immunity attaches only to conduct by a state official that is discretionary, rather than ministerial, in nature. *Currie*, 148 Ill. 2d at 166. In *Janes*, *Watson*, and *Madden*, the appellate court rejected the defendants' arguments, finding that because the

duties of the defendant physicians and nurses arose from their professional relationships with the plaintiffs, they were not engaged in actions of a governmental character, and, therefore were not engaged in the type of discretionary conduct required to invoke public official immunity. *Janes*, 254 Ill. App. 3d at 964; *Watson*, 68 Ill. App. 3d at 1055; *Madden*, 56 Ill. App. 3d at 1002.

As stated, public official immunity is a common law defense to liability for employees of the State of Illinois, where those employees engage in discretionary functions. This concept is inapposite to the matter at bar, where defendants, a local public entity and its public employees, are specifically immunized pursuant to the Tort Immunity Act. Indeed, this court has previously rejected attempts to incorporate the common law discretionary/ ministerial distinction into provisions of the Tort Immunity Act. See *Epstein v. Chicago Board of Education*, 178 Ill. 2d 370, 380 (1997) (rejecting attempt to import the discretionary/ministerial distinction into section 3—108(a) of the Tort Immunity Act). As discussed above, courts must not read conditions into the Tort Immunity Act that conflict with its plain meaning. *Garza*, 172 Ill. 2d at 378.

As its final contention, plaintiff argues that holding defendants immune from liability under the facts presented in this cause conflicts with public policy as previously expressed by this court in *O'Brien v. Township High School District 214*, 83 Ill. 2d 462 (1980). We disagree with plaintiff's assertion, and stress that our holding today does not alter our prior pronouncement in *O'Brien* that "public policy, as expressed in [section 6—106], militates in favor of holding public employees liable for negligently prescribing or administering treatment which causes injury." *O'Brien*, 83 Ill. 2d at 468. Neither the Act nor our decision today immunizes negligent treatment from liability.

Plaintiff also contends that immunizing local public entities and their public employees from liability for failing to examine, improperly examining, or diagnosing patients provides incentive to simply refuse to examine and/or diagnose patients. Although we understand, and are sympathetic to, plaintiff's concerns, we are constrained to apply the law as enacted by the General Assembly. "Under the doctrine of separation of powers, courts may not legislate, rewrite or extend legislation. If the statute as enacted seems to operate in certain cases unjustly or inappropriately, the appeal must be to the General Assembly, and not to the court." *People v. Garner*, 147 Ill. 2d 467, 475-76 (1992). Simply put, it is not within the purview of this court to rewrite portions of the Tort Immunity Act. Because the concerns voiced by plaintiff compete with the legislative purposes of the immunity provisions as revealed by the statute's plain language, we believe that these are questions appropriately left to the legislature.

## CONCLUSION

For the foregoing reasons, we hold that defendants are immunized from liability pursuant to sections 6—105 and 6—106 of the Tort Immunity Act. The judgment of the appellate court is affirmed.

*Affirmed.*

CHIEF JUSTICE HARRISON, dissenting:

The Local Governmental and Governmental Employees Tort Immunity Act is in derogation of the common law action against local public entities. It must therefore be strictly construed against the public entity involved. *Aikens v. Morris*, 145 Ill. 2d 273, 278 (1991). Applying this strict construction, I would hold that plaintiff may proceed against defendants pursuant to sections 6—106(c) and 6—106(d) of the Act (745 ILCS 10/6—106(c), (d) (West 1992)). Sections 6—106(c) and 6—106(d)

specify that public entities and their employees are not exonerated from liability for injuries proximately caused by their negligence in prescribing or administering treatment for physical illness. There is no question that defendants prescribed and administered treatment for the decedent's illness in the case before us. The problem with their conduct, and the reason they are not immune, is that after they ascertained that the decedent was afflicted with a physical condition that posed a hazard to her health, they prescribed a course of care that was fatally deficient. Instead of ordering mammograms and biopsies, chemotherapy or surgery, defendants relegated the decedent to a passive regimen of waiting and watching, and they waited too long.

Because the wrong remedy was wrongly administered, defendants' conduct falls squarely within the terms of subsections (c) and (d) of section 6—106. Any other conclusion is inconsistent with the public policy underlying that statute, which "militates in favor of holding public employees liable for negligently prescribing or administering treatment which causes injury." *O'Brien v. Township High School District 214*, 83 Ill. 2d 462, 468 (1980). Accordingly, the judgment of the circuit court should be reversed, and the cause should be remanded for further proceedings. I therefore dissent.